STATE of Minnesota, Respondent,

v.

Ian Garfield JAMES, Appellant.

No. C9–93–1566.

Supreme Court of Minnesota.

Aug. 26, 1994.

John M. Stuart, State Public Defender, Charlann E. Winking, Asst. Public Defender, Minneapolis, for appellant.

Michael O. Freeman, Hennepin County Atty., Linda M. Freyer, Asst. County Atty., Minneapolis, and Hubert H. Humphrey, III, Atty. Gen., St. Paul, for respondent.

## OPINION

TOMLJANOVICH, Justice.

Ian Garfield James was convicted by a Hennepin County jury of the premeditated murder of Perry Pajunen and was sentenced to life imprisonment. James appeals his conviction on the grounds that a prospective juror was improperly excused because of her race and because of other instances of prosecutorial misconduct. We affirm.

The facts are not disputed. They are given in detail in *State v. McKenzie,* 511 N.W.2d 14, 15–16 (Minn.1994), where we reviewed the appeal of James' co-defendant, Rene McKenzie. Briefly, James and McKenzie shot and killed Perry Pajunen. They were drug dealers who shared an apartment with Juanita Gatlin and Janine Gatlin. Juanita and Janine Gatlin are cousins. Pajunen was a crack addict who frequently bought drugs from James and McKenzie. James blamed Pajunen for his being arrested by police and having $1,600 confiscated, although Pajunen had nothing to do with the arrest. James had McKenzie's girl friend, Juanita Gatlin, lure Pajunen to their apartment promising to sell him drugs. Instead, James and McKenzie killed him.

James did not testify at trial. In pre-trial statements James made to the police, he denied having killed Pajunen. He raises no issues related to the circumstances of Pajunen's death in his appeal. He does contend he is entitled to a new trial, however, because the prosecutor struck a juror solely because of her race and because the prosecutor committed other misconduct.[1]

In *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986), the Supreme Court held purposeful racial discrimination in jury selection violated the Equal Protection Clause of the Fourteenth Amendment. In *Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1865–66, 114 L.Ed.2d 395 (1991), the Court outlined a three-step process for trial court evaluation of a claim the prosecutor used a peremptory challenge with a racially discriminatory intent:

First, the defendant must make a prima facie showing that the prosecutor has exer-

1. In his pro se brief, James also argues the trial judge improperly instructed jurors they could consider the "witness' manner and appearance" in determining the credibility of a witness. James believes the instruction indicates more credibility should be given to people with a professional, well-dressed appearance than to people like him from a low income background. The instruction on credibility followed CRIMJIG 3.12 verbatim and the defense could have, but did not, suggest a different instruction. Although we do not find the trial judge erred, we urge trial judges to be sensitive when wide disparities of dress, income, and education exist among witnesses that jurors do not misunderstand the instruction. It may be preferable to simply use the term "manner" as the Eighth Circuit does. *Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit,* 3.04 (1992).

cised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

(Citations omitted.)

Fifty-two people were questioned for jury service in James' trial. Of the first jury venire of forty people, two were African-Americans, Mr. B. and Ms. R.[2] Mr. B. was questioned first. Before beginning his examination of Mr. B., the prosecutor informed the court and opposing counsel he might excuse Ms. R. because she resided six blocks from where Juanita Gatlin's family lived and might know them. The prosecutor expressed concern that if the defense excused Mr. B. and he excused Ms. R., the jury might not contain any African-Americans.[3] Neither party excused Mr. B.

The prosecutor did strike Ms. R. and defense counsel challenged the strike. The prosecutor gave two reasons for striking: First, because:

[S]he lives just a short distance from where the Gatlin family lives. And they have extended family members that have lived in the area. They have siblings, nieces and nephews, cousins that are approximately the same age as her child. For all I know her child may play with some of the relatives. And during the course of the trial it may turn out that her child, one

of her child's friends is related to Janine Gatlin, Juanita Gatlin, whatever;[4]

and second, because:

[S]imply the fact that it sounds as if I was the issuing Assistant County Attorney that issued the complaint against the woman that hit her [Ms. R.'s] sister with the chair. My name would be on that complaint as the issuing Assistant County Attorney. And apparently she is concerned about the delay in the handling of her sister's case.

The trial court found the prosecutor had articulated two alternative bases for a nonracially motivated peremptory challenge and gave defense counsel an opportunity to prepare a brief to rebut. At the subsequent hearing, Judge Montgomery asked the prosecutor if he had determined whether he indeed was the charging prosecutor in Ms. R.'s sister's case. The prosecutor stated he had not investigated the matter. Nor could he resolve the matter during a recess the court allowed for that purpose.

The defense attacked the prosecutor's reasons for excusing Ms. R., because she denied knowing the Gatlins and the Bennifields[5], and further because she stated she did not know who the prosecutor charging her sister's case was. The prosecutor responded that the Gatlins and Bennifields were large extended families whose members lived in the same area of the city where Ms. R. has lived all her life and where Ms. R.'s parents live. He argued that even though he was unable to locate any case he had charged involving Ms. R.'s sister, there might be such a case because people frequently used different names in making a complaint. The defense insisted these explanations were invalid. If the critical problem was whether Mrs.

2. Mr. B. stated he was employed as a senior accounting/financial analyst and lived in Eden Prairie. Ms. R. stated she was employed as a data processing supervisor. She worked the third shift in a downtown Minneapolis office building.

3. The jury that was ultimately seated had two African-American members.

4. An officer testified that when they were arrested, Juanita Gatlin and McKenzie were "possibly staying in an apartment in North Minneapolis, around the 2400 block of Plymouth Avenue North." After moving out of the Lyndale Avenue

North apartment, Juanita Gatlin testified she stayed with a friend, then went to North Dakota, and then stayed with her mother. There is no indication of how long she stayed at any of these places. The record does not indicate where Janine Gatlin or James lived after leaving the Lyndale Avenue North apartment in 1991. Like Juanita Gatlin and McKenzie, they too were arrested near the 2400 block of Plymouth Avenue North.

5. Juwan Bennifield was with James when he was arrested and had the $1,600 confiscated, an arrest James blamed on Pajunen. Juwan Bennifield is also Juanita Gatlin's father.

R. knew any of the witnesses,[6] the defense argued, she should be shown pictures of the witnesses.

The trial judge attached little importance to the prosecutor's fear he may have been the charging prosecutor in Ms. R.'s sister's case. She attached far greater importance to Ms. R.'s residence:

> Clearly, the living within six blocks proximity of what I understand to be the informant or at least someone who has made a plea bargain [Juanita Gatlin] with the prosecutor to testify in this case, I think is a factor that must be evaluated. I think the background, the life-long history of Juror [R.] and her family growing up in this area, as well as the Gatlin and Bennifield family, satisfies me that that is the actual and not merely a pretextual reason for the strike or use of the peremptory challenge.

■ The state alleges the defendant did not make a prima facie showing of discrimination. The state argues a defendant's "bare reliance" on a government strike of a minority venireperson is insufficient to make a prima facie case when the government does not challenge other minority venirepersons. *United States v. Porter,* 831 F.2d 760, 767–68 (8th Cir.1987), *cert. denied,* 484 U.S. 1069, 108 S.Ct. 1037, 98 L.Ed.2d 1001 (1988). The trial court did not specifically state a prima facie case had been made, but the prosecutor did give two reasons for excusing Ms. R. and the trial court did rule against the defense's *Batson* challenge, and gave her reasons for doing so. Whether the defendant made a prima facie showing of discrimination is moot. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York,* 500 U.S. 352, 359, 111 S.Ct. 1859, 1865, 114 L.Ed.2d 395 (1991); *see also State v. Scott,* 493 N.W.2d 546, 548 (Minn.1992).

As to the race-neutrality of the prosecutor's reasons, in *State v. McRae,* 494 N.W.2d 252, 254 (Minn.1992), we said:

> *Hernandez* makes it clear that the explanation provided by the prosecutor does not have to be "valid" in the sense of establishing a reasonable cause for challenge, but the explanation must be race-neutral. As the Court put it:
>
>> At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

(Citations omitted.)

■ James argues that neither reason the prosecutor gave for excusing Ms. R. was facially valid. First, James contends Ms. R. could not be legitimately excused on the basis of her residency. If residence were to be applied race-neutrally, then the residence of every juror should have been significant to the prosecutor and he should have been equally concerned that other jurors might know either the Gatlins or the Bennifields.[7] A white juror who had also lived for many years in the same area as Ms. R. was not asked whether she knew the Gatlins or Bennifields. That juror, however, moved from Ms. R.'s North Minneapolis neighborhood at

---

6. Ms. R. appeared definite in stating she did not know any Gatlins or Bennifields:

> Most of the people that—I was born and raised in Minnesota in North Minneapolis, and most of the people I know I've known for years and years and years. And since I've been an adult I have not met that many more people, I mean, other than the people that I work with. So I would remember those names. As far as my daughter goes, I keep tight reigns on my daughter. She has rules and regulations that she has to follow. And I know the kids that she plays with outside. I keep in close contact with her school teacher. And again, those names do not ring a bell.

7. James also finds other inconsistencies in the prosecutor's treatment of jurors who, it turned out at trial, knew witnesses or knew people mentioned by witnesses. One juror, Ms. Ware, indicated that she might know Luticha Gatlin, a relative of Juanita Gatlin's. Luticha Gatlin's name came up once during the course of the trial but was not involved in the trial in any way. Mr. B., the African–American juror, also indicated that he knew by sight a detective who testified at the trial. Neither defense counsel nor the prosecutor requested either juror be removed and replaced with an alternate.

age 18 upon graduation from high school in 1976. We see little importance in the prosecutor's failure to question her about the Gatlins and Bennifields.

We find more significant Ms. R.'s statement that she did not know any members of either the Gatlin or Bennifield families and had no knowledge of the arrests made in the case. A number of federal courts have recognized that because of racially segregated residential areas, residence could be used as a pretext for discrimination. James argues the ratio of black to white residents is much higher in Ms. R.'s neighborhood than it is in Minneapolis as a whole. Peremptory challenges based on residence in Ms. R.'s neighborhood would disproportionately exclude African–Americans.

While federal courts have found residence cannot legitimately serve as a proxy for racial stereotypes, courts have allowed peremptory challenges based on residence when related to the facts of the case. As the Ninth Circuit stated in *United States v. Bishop,* 959 F.2d 820, 826 (9th Cir.1992):

> What matters is not *whether* but *how* residence is used. Where residence is utilized as a link connecting a specific juror to the facts of the case, a prosecutor's explanation based on residence could rebut the prima facie showing. A trial judge need not believe the explanation to be wise; she need only believe it to be non-pretextual.

(Emphasis in original.) In *Bishop* the court found a *Batson* violation occurred when the prosecutor struck an African–American juror who lived in a poor neighborhood because the prosecutor felt the juror was likely to believe police "pick on black people." *Id.* at 821. The courts in both *United States v. Mitchell,* 877 F.2d 294, 303 (4th Cir.1989) and *United States v. Briscoe,* 896 F.2d 1476, 1488–89 (7th Cir.), *cert. denied,* 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990), did not find *Batson* violations in residence-based exclusions of African–American jurors. In both cases, the use of peremptory challenges was sustained because it was possible the jurors knew the government's witnesses. In *Mitchell,* the government witness was the political representative of several jurors. In *Briscoe,* the witnesses were drug dealers who operat-

ed in the juror's neighborhood. The appellate court specifically did not find the possibility the juror knew either of the witnesses too remote to invalidate the exclusion.

As to James's argument that because Ms. R. said she was not familiar with the Gatlins or Bennifields, the prosecutor's reasons for striking her must be pretextual, the State responds that *Batson* only requires a race-neutral reason related to the case. The reason need not rise to the level of striking for cause. The State also argues that disparate impact alone does not prove the prosecutor's explanation was pretextual—intent to cause the disparate impact is required. *Hernandez,* 500 U.S. at 361–62, 111 S.Ct. at 1867–68 (stating "disproportionate impact does not turn the prosecutor's actions into a per se violation of the Equal Protection Clause. * * * Unless the government actor adopted a criterion with the intent of causing the impact asserted, that impact itself does not violate the principle of race-neutrality.").

■ James claims the prosecutor's concern that he was prosecuting her sister's case and that Ms. R. was upset about the progress of the case is also pretextual. James contends the prosecutor exaggerated Ms. R.'s concern and that the record does not support the prosecutor's position, and therefore, this reason for striking her cannot be legitimate. Between the time the prosecutor struck Ms. R. and the court held the *Batson* hearing, the prosecutor made no effort to determine if he had charged the sister's complaint. At the beginning, the judge directed him to check and he found nothing. He speculated that either his office was not charging the crime or that Ms. R.'s sister made the complaint under a different name, something he said occurred frequently. We find the trial judge did not err in finding the prosecutor's reasons facially race-neutral. Neither reason the prosecutor gave rests on Ms. R.'s race.

■ The final *Batson* issue to consider is the trial court's evaluation of the prosecutor's intent. Whether racial discrimination has been proved is "an essentially factual determination," which typically "will turn largely on an evaluation by the trial court of credibility." *State v. McRae,* 494 N.W.2d at

254 (citing *Hernandez,* 500 U.S. at 364–370, 111 S.Ct. at 1869–71); *see also State v. Scott,* 493 N.W.2d 546, 549 (Minn.1992). A trial court's determination of the genuineness of the prosecutor's response "is entitled to 'great deference' on review." *State v. Everett,* 472 N.W.2d 864, 868 (Minn.1991) (quoting *State v. Moore,* 438 N.W.2d 101, 107 (Minn. 1989)); *see also Hernandez,* 500 U.S. at 364, 111 S.Ct. at 1868. In *Hernandez,* the Court held the clearly erroneous standard of review applied to this factual determination by the trial court. *Hernandez* 500 U.S. at 369, 111 S.Ct. at 1871. Disproportionate impact of juror challenges does enter into the trial court's evaluation, but such impact does not necessarily determine the question:

> If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination.

*Hernandez,* 500 U.S. at 363, 111 S.Ct. at 1868. In a recent case, the court of appeals noted "that some reasons, such as location of residence, prior involvement by juror or family member with the law, age, or level of education, provide objective and more easily verifiable race-neutral grounds for striking a juror." *State v. Weatherspoon,* 514 N.W.2d 266, 269 (Minn.App.1994), *pet. for rev. denied* (Minn. June 15, 1994).

James argues the trial court committed reversible error by failing in its "duty to decide if there has been purposeful discrimination." The trial court "merely parroted and ratified the prosecutor's articulated reasons." James points out the crime occurred in South Minneapolis and that Ms. R.'s North Minneapolis neighborhood had only a tenuous relation to the case—Juanita Gatlin's family lived there and James, McKenzie, and Juanita and Janine Gatlin were arrested there. If residence without more is accepted as a reason to exclude jurors, and if crimes are more frequently committed in areas where minorities live, then it follows that minorities will more frequently be excluded from juries. Thus, James contends permit-ting this kind of strike will have a disparate impact on the racial composition of juries.

The State contends the trial court carefully considered the prosecutor's explanation. The court did not find his concerns about Ms. R.'s sister's case completely allayed by the computer search. The court found more significant the prosecutor's concern that Ms. R. might know certain witnesses.

■ On the facts of this case, we do not believe the trial court's ruling was clearly erroneous. The disparate impact argument James makes has some validity, but we see little to be gained by breaking up the voir dire process with hearings on demographics and statistics. At some point, the connection of residence with the facts of a case must become too remote to be anything other than pretextual. But here, Ms. R. lived her entire life near the Gatlin and Bennifield residences. Her parents have and continue to live close to those families and to the site where James and the others were arrested. Although it seems unlikely to us that the prosecutor's fear that Ms. R. might recognize the Gatlins or Bennifields, or might learn something about them from her neighbors and friends would be realized, we cannot equate unlikeliness with pretext. *Batson* prohibits race-based exercises of peremptory challenges, but not peremptory strikes based on legitimate concerns that a prospective juror might know a key witness or have some connection with people who figure prominently in the case. Had Ms. R. not been a lifelong resident of the area, the trial court might well have determined the prosecutor's reasons were pretextual.

The prosecutor's second reason for striking Ms. R., that he may have been involved in Ms. R.'s sister's case, seems remote. However, since the trial court found his first reason was not pretextual, and we do not find that decision clearly erroneous, we need not review the second reason. We note the reasons the prosecutor gave were not compelling reasons, but they facially did not involve racial stereotypes. Overruling the trial judge would place prosecutors in the position of trying to balance the risk of a mistrial because a juror may have independent knowledge of the facts of a case and the risk

that a *Batson* challenge to an exclusion based on residence will succeed.

■ The other claims in James' appeal involve prosecutorial misconduct. A prosecutor has the obligation " 'to guard the rights of the accused as well as to enforce the rights of the public.' " *State v. Salitros,* 499 N.W.2d 815, 817 (Minn.1993) (quoting I ABA Standards for Criminal Justice, The Prosecution Function 3–1.1 and Commentary at 3.7 (2 ed.)). James contends the prosecutor failed to meet this obligation in two ways. First, the prosecutor asked questions of an officer that indirectly allowed the jury to infer facts about James' prior Florida arrest. Additionally, the prosecutor failed to instruct Juanita Gatlin to avoid mentioning James had been charged with a homicide in Florida. Improperly admitted evidence is subject to harmless error analysis. *See State v. Howard,* 324 N.W.2d 216, 224 (Minn.1982), *cert. denied,* 459 U.S. 1172, 103 S.Ct. 818, 74 L.Ed.2d 1016 (1983); Minn.R.Crim.P. 31.01. Second, James argues the prosecutor erred by making a closing argument "replete with improper and inflammatory remarks." With respect to the final argument, we said in *State v. Parker,* 353 N.W.2d 122, 127–28 (Minn. 1984):

> The propriety of a prosecutor's final argument is a matter within the sound discretion of the trial court. Generally, a defendant is deemed to have waived his right to raise an issue concerning the prosecutor's closing remarks if the defendant fails to object or seek cautionary instructions. Notwithstanding this general principle, this court can reverse a conviction even when defendant failed to preserve the issue on appeal, if the prosecution's comment are unduly prejudicial.

(Citation omitted.)

James was originally arrested in Minneapolis on a Florida murder charge. At a pretrial hearing, the trial court ruled officers could testify concerning the arrest, but not on the crime for which James was charged. The prosecutor prefaced two of his questions to a detective with directions not to mention his department or the crime James was charged with in Florida. The prosecutor also had the detective state the Florida charge against James had been dropped. In response to a question that was not directed at eliciting any information about what James was wanted for in Florida, Juanita Gatlin mentioned James was wanted for murder in Miami.

■ We note the defense made no objection to the prosecutor's questioning of the detective at the time, and further, considering all the evidence presented at trial, any prosecutorial misconduct was harmless. While in hindsight it seems the prosecutor should have instructed Juanita Gatlin to avoid any mention of the Florida charge, we agree with the trial court that the reference was spontaneous. Judge Montgomery's order only specifically mentioned the Florida police officers and defense counsel made no request with respect to other witnesses. The trial court further properly instructed the jury to ignore the remark, emphasizing the charges had been dismissed. Jurors are presumed to follow instructions. *State v. Forcier,* 420 N.W.2d 884, 885 n. 1 (Minn.1988).

■ James also alleges the prosecutor committed misconduct by informing the jury of his personal opinion of James' credibility and character and the credibility of Juanita Gatlin, by disparaging the theories defense counsel would likely advance in closing argument, and by misleading the jury as to the state's burden of proof. Similar allegations were made about the same prosecutor's conduct in the trial of James' codefendant, Rene McKenzie. *State v. McKenzie,* 511 N.W.2d at 17. As in *McKenzie,* defense counsel also responded to the characterizations by using them to open his closing argument and he too took liberties with opinion testimony in his closing argument. *Id.* We follow *McKenzie* in finding the prosecutor's comments improper, but, in the context of the entire proceeding, harmless. We do not believe the prosecutor misled the jury about the standard for conviction.

Affirmed.

PAGE and ANDERSON, JJ., took no part in the consideration or decision of this case.