**STATE of Minnesota, Respondent,**

v.

**Israel Ray GAITAN, Jr., Appellant.**

**No. C8–94–1178.**

Supreme Court of Minnesota.

Aug. 18, 1995.

John M. Stuart, State Public Defender, Minneapolis, and John S. Lind, Sp. Asst. State Public Defender, Duluth, for appellant.

Israel Ray Gaitan, Oak Park Heights, pro se.

Hubert H. Humphrey, III, Atty. Gen., Mary J. Thiesen, Asst. Atty. Gen., St. Paul, and Kathryn M. Keena, Lyon County Atty., Marshall, for respondent.

OPINION

KEITH, Chief Justice.

Defendant, Israel Ray Gaitan, Jr., directly appeals his conviction of first-degree felony murder (and included offenses under Minn. Stat. § 609.04 (1994)), for which he is serving a sentence of life in prison. Defendant argues he is entitled to outright reversal of his conviction on the ground the evidence of his participation in the crime was legally insufficient. Alternatively, he seeks a new trial on either or both of two grounds: (a) the prosecutor had a racially discriminatory intent in peremptorily striking a Mexican–American woman from the jury panel, and (b) the prosecutor committed prejudicial misconduct during opening statement, direct examination of a state's witness, cross-examination of defendant, and closing argument. We affirm.

This prosecution arises from the July 17, 1993, killing of 56–year–old Ramon Guardiola in Tracy, Minnesota. The state's theory of the case was that defendant, Julio Rodriguez, and Gilberto Arredondo [1]—who were coworkers of the victim at Heartland Foods and were from the same town in Texas as the victim—aided and abetted each other in the crime.

1. Defendant seeks outright reversal of his conviction on the ground the evidence was insufficient to connect him to the crime. Specifically, defendant argues that the con-

---

1. Note the correct spelling of Arredondo's surname. Cf., State v. Arrendondo, 531 N.W.2d 841 (Minn.1995).

viction rests on uncorroborated accomplice testimony.

Minn.Stat. § 634.04 (1994) provides:

A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

Rodriguez, who pleaded guilty to second-degree felony murder and received an 8-year prison term for his role in the murder, testified at defendant's trial that he and his roommate, Arredondo, spent the night in question drinking beer at the house shared by defendant and his roommate, Juan Orduna, both of whom were present. Rodriguez and Orduna were also sniffing paint, and Rodriguez was also smoking marijuana. Rodriguez testified that three teenagers arrived and asked him to buy them alcohol. Rodriguez rode with them to a liquor store, where he bought them a bottle of schnapps. When Rodriguez returned to the house, he was asked by defendant to buy beer. Rodriguez rode with the teenagers back to the liquor store. There he ran into the victim, a neighborhood acquaintance. Together they walked back toward defendant's residence and the residence where the victim lived.

When they reached defendant's residence, Rodriguez invited the victim to join them in drinking beer. The victim, explaining that defendant did not like him, was reluctant to join the party; he accepted the invitation after Rodriguez said he did not think there would be a problem.

While the victim was there drinking with them, Arredondo conceived of a plan to rob the victim—who was known to carry a sizeable amount of cash on his person—after first "spiking" his drink with Tegretol, a drug that Rodriguez was taking for seizures, which they believed would make the victim fall asleep. The victim drank some of the tainted liquor but did not fall asleep. Defendant then began to physically assault the victim. Arredondo and Rodriguez quickly joined in the assault. During the beating, Rodriguez took the victim's wallet, removed five $20 bills and returned the wallet to the victim's pants. At some point defendant said they had to "get rid of the problem" and got a shotgun. Orduna intervened, taking the gun from defendant. Arredondo then began walking the victim toward a nearby drainage ditch, where the water was waist high. Arredondo later returned to the house with mud on his face and said that as he and the victim fell into the ditch, the victim grabbed his neck, causing him to strike his head on the bottom of the ditch and twist his neck. Arredondo then left the house again. Rodriguez testified he subsequently went to the ditch to see what was happening and saw defendant and Arredondo standing in the water and the victim, who was dead, floating on his back. When Rodriguez asked if the victim was dead, defendant replied that he was "about as dead as they come." As he said this, defendant smacked the victim's exposed abdominal area twice. Rodriguez then jumped in the water and helped the men move the body. He testified he heard a dog barking from the area of a nearby warehouse as they did this.

The three men then returned to defendant's house, where they showered and changed into clean clothing. Afterward, defendant demonstrated how he had shoved the victim's head under water and he said that he would do the same to anyone who said anything. Rodriguez then gave defendant the $20 bills, and defendant gave each man one of them.

Rodriguez testified that he then went with Arredondo to Arredondo's residence, where they put some household trash in with a bag containing their dirty clothes, then threw the bag in a nearby dumpster.

Rodriguez then sold his car to Arredondo's girlfriend, with whom he and Arredondo spent the night. Rodriguez and Arredondo thereafter caught a bus from Worthington to Texas, where they were eventually apprehended.

The victim's body was discovered on July 19. An area pathologist, Dr. Brad Randall, who examined the body, testified that there were three possible causes of death: skull fracture, neck injury, or drowning. Dr. Mi-

chael McGee, who later examined the Bureau of Criminal Apprehension (BCA) and autopsy reports, testified the most logical cause of the victim's death was drowning. Special testing done at St. Paul Ramsey Medical Center disclosed the presence of low amounts of Tegretol in the victim's blood.

Arredondo refused to testify. The trial court sustained defendant's objection to the admission of a taperecording and transcript of a statement Arredondo gave in Texas after his arrest, holding that under *State v. Hansen*, 312 N.W.2d 96 (Minn.1981), admission of the evidence would violate defendant's right to confront his accusers.

The state also tried to procure the testimony of Orduna, but he was unavailable. The state therefore sought the admission of testimony Orduna had given at Arredondo's trial, arguing that Orduna's unavailability resulted from threats by defendant. The trial court refused to admit the evidence, ruling that the state had failed to prove that Orduna's unavailability was caused by defendant and ruling further that the prior testimony was not so clearly reliable as to be admissible over defendant's Sixth Amendment objection.

The state also tried to procure the testimony of Maria Villarreal, who lived with Arredondo and Rodriguez, but learned that she had moved to Mexico. The trial court ruled that her grand jury testimony contained sufficient indicia of reliability and admitted it over defendant's Sixth Amendment objection. In her testimony before the grand jury, Villarreal said that she was awakened late on July 17 by noises in the kitchen, that Rodriguez and defendant were there with Arredondo, and that Rodriguez did something unusual: he collected trash in a large trash bag, then took it outside and dumped it.

Shelly Gilbertson, Arredondo's girlfriend, testified that she went to Arredondo's residence shortly after 11:00 p.m. on July 17 but no one answered the door. She testified that she went back 45 minutes later and found Arredondo and Rodriguez. She testified that defendant arrived later, saying to Arredondo and Rodriguez, "If one goes down, we'll all go down, right?" She testified that she also bought Rodriguez' car from him and drove

Arredondo and Rodriguez to Worthington on July 19 to catch a bus headed for Texas.

Two of the three teenagers referred to by Rodriguez also testified, saying that on the night in question Rodriguez had bought liquor for them and that they had driven him back to the liquor store at his request. They testified that Rodriguez got out and spoke with a Hispanic male (presumably the victim) and said he would walk back with him.

The state also presented testimony concerning police investigation of a complaint at 11:18 p.m. on July 17 of a barking dog a quarter of a block from where the victim's body was found.

Defendant, who testified in his own behalf, denied he was with the men on the night in question and denied involvement in the murder.

■ Defendant argues that in determining sufficiency of the corroboration of the accomplice testimony by Rodriguez, we should not consider the grand jury testimony of Villarreal. He argues that this testimony was admitted in violation of his Sixth Amendment right to confront his accuser. We do not believe it was error to admit the grand jury testimony of Villarreal. In any event, even if it were deemed to have been erroneously admitted, we still would consider the evidence in reviewing the sufficiency of the evidence claim. As Justice Yetka said in *State v. Kraushaar*, 470 N.W.2d 509, 513, n. 3 (Minn.1991), "In reviewing sufficiency of evidence, courts should include any erroneously admitted evidence; otherwise the state would have an incentive to 'over-try' cases." *See*, among other cases explaining this, *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).

■ Apart from the considerable evidence confirming key parts of Rodriguez' testimony concerning the commission of the crime, evidence which we need not again summarize, there was other evidence corroborating Rodriguez' testimony in the sense required by section 634.04, that is, evidence pointing to defendant's guilt. The corroborating evidence included, in addition to the grand jury testimony of Villarreal, the testimony of Gilbertson concerning defendant's presence and

statements at the residence of Arredondo and Rodriguez later on the night of the murder, and defendant's admission on cross-examination that he shaved his beard (in other words, changed his appearance) after the murder. In short, there clearly was sufficient corroborating evidence and we are satisfied that the evidence of defendant's guilt was sufficient to sustain the conviction.

2. Defendant's second contention is that he should be given a new trial because the prosecutor had a racially discriminatory intent or motive in peremptorily striking a Mexican–American woman from the jury panel.

■ If the prosecutor indeed had such an intent or motive, then defendant would be automatically entitled to a new trial, because harmless error impact analysis is "inappropriate in the case of a defendant convicted by a petit jury if there was racial discrimination in the selection of the jury." *State v. McRae,* 494 N.W.2d 252, 260 (Minn.1992).

■ In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court adopted a three-step procedure for the trial court to use in addressing a defense claim that the prosecutor's peremptory challenge of a jury is motivated by racial discrimination. The *Batson* procedure, as subsequently summarized in *Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991), is as follows:

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. [Citation omitted]. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. [Citation omitted]. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. [Citation omitted].

■ As we said in *State v. Stewart,* 514 N.W.2d 559, 563 (Minn.1994), "A prima facie case of racial discrimination is established by showing that one or more members of a racial group have been peremptorily excluded from the jury and that circumstances of the case raise an inference that the exclusion was based on race." Where, as here, the trial court proceeded to the second step in the process, the issue whether the defendant established a prima facie case of the discriminatory use of a peremptory strike is moot. *State v. Scott,* 493 N.W.2d 546, 548 (Minn. 1992) (citing *Hernandez,* 500 U.S. at 359, 111 S.Ct. at 1866.) Moreover, the state in this case concedes that the prosecutor admitted at trial that a prima facie case was established.

While we are not concerned with the first step, we are concerned with the second and third steps. We summarized these two steps, as well as the scope of appellate review, in our decision in *McRae,* 494 N.W.2d at 254:

> *Hernandez* makes it clear that the explanation provided by the prosecutor does not have to be "valid" in the sense of establishing a reasonable cause for challenge [500 U.S. at 362–64], 111 S.Ct. at 1868, but the explanation must be race-neutral. As the Court put it:
>
> > At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent was inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.[2]
>
> [500 U.S. at 358–59] 111 S.Ct. at 1866.

Once the prosecutor has given a facially valid race-neutral explanation, then the trial court, considering all the relevant facts bearing on the issue, must make what the court in *Hernandez* characterized as an

---

2. Recently, in *Purkett v. Elem,* —— U.S. ——, ——, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995), the Court, in a per curiam opinion, expanded on this language, stating that it is not necessary that the prosecutor's explanation make sense, only that the explanation, looked at on its face, is racially neutral. However, consistent with the discussion of step three in *Hernandez* (*see* quoted excerpt from *McRae,* above), the Court in *Purkett* made it clear that at step three "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.*

essentially factual determination of whether the defendant has proven that the prosecutor acted with discriminatory intent or purpose. [500 U.S. at 362–66] 111 S.Ct. at 1868–69. If the basis for the challenge given by the prosecutor is one that will result in the disproportionate exclusion of members of a certain race, the trial court may consider that as one of the relevant circumstances bearing on the determination whether the facially-valid reason given by the prosecutor is a pretextual explanation offered to mask a discriminatory intent. *Id.* As always, of course, considerable deference must be given by a reviewing court to the trial court's finding on the issue of intent because the finding typically will turn largely on an evaluation by the trial court of credibility. *Id.* [500 U.S. at 366–69] 111 S.Ct. at 1869–71. Moreover, United States Supreme Court has indicated that it will give state court review of such a finding a presumption of correctness and will reverse the state court only if the finding is clearly erroneous. *Id.* [500 U.S. at 366–69] 111 S.Ct. at 1870–71.

■ Here it is clear that the prosecutor articulated a race-neutral explanation for the peremptory challenge. Immediately after she exercised the strike, the prosecutor explained that she did so because of the juror's "ninth grade education level. She was having a very difficult time understanding a lot of the terms that we were using." This explanation, although likely to have a disproportionate impact on individuals whose first language is not English, and consequently, on non-English-speaking minorities, is nevertheless facially valid. *See Hernandez,* 500 U.S. at 361, 111 S.Ct. at 1867 ("While the prosecutor's criterion might well result in the disproportionate removal of prospective Latino jurors, that disproportionate impact does not turn the prosecutor's actions into a per se violation"). In response to the state's request to research the law on the issue after the trial court initially sustained defendant's objection to the peremptory challenge, the trial court agreed to hear further arguments the following morning. That morning the prosecutor advanced three race-neutral explanations for the peremptory strike: lack of education, demeanor, and reluctance to sit in judgment. Defense counsel countered: that the juror in question testified that she had the equivalent of a high school education in the United States and that other jurors with a high school education had been accepted by the state; that nervousness is normal; and that the juror, upon further inquiry regarding sitting in judgment, indicated she could be fair and unbiased.

The trial court, in finding that the state's motivation was genuine and the reasons given were not a pretext for racial discrimination, noted that the juror's 9 years of schooling in Mexico were not equivalent to a 12-year high school education in the United States and that the prosecutor had exercised another peremptory challenge against another juror, a high school teacher, who, like the juror in question, had expressed reluctance to sit in judgment on other people.

■ Giving, as we must, "considerable deference" to the trial court's finding on the issue of intent and motivation, *Hernandez,* 500 U.S. at 368, 111 S.Ct. at 1871, we conclude that the trial court's determination that there was no purposeful discrimination must be sustained. We refuse to adopt a bright-line rule that if the prosecutor fails to immediately give the reasons for exercising the peremptory challenge, the reasons may not be relied upon. *State v. Moore,* 438 N.W.2d 101, 107 (Minn.1989). The trial court is free to base its determination on all of the relevant factors.

3. Defendant's final contention is that the prosecutor committed misconduct and that he is entitled to a new trial because the misconduct was not harmless but was prejudicial.

■ Defendant points first to the prosecutor's unobjected-to reference in opening statement to the fact that Arredondo's statement to the police implicated defendant. We agree that since there was some indication at that time that Arredondo would refuse to testify and that his statement might be inadmissible, the prosecutor should not have mentioned this in the opening statement.

Defendant points next to the prosecutor's elicitation, first, of testimony by a BCA agent

that he had interviewed Arredondo in Texas and that his statement was "consistent" with Rodriguez' statement and, second, of testimony by the agent that he later questioned Orduna and his statement too was "consistent." Defense counsel objected on hearsay grounds to this testimony. The trial court sustained both objections and, after sustaining the second objection, struck the answer and instructed the jury to disregard it.

Defendant also complains about the prosecutor asking him on cross-examination whether he had sexually assaulted the victim in the ditch, to which defendant replied, "No, I did not." The prosecutor also asked defendant if he had been telling other inmates at the jail that if he went to prison, he was going to kill one person for each year he spent there; defendant denied making such statements. The prosecutor also asked defendant a number of times if witnesses whose testimony was contradictory to his were lying. Defendant failed to object to any of these questions.

Finally, defendant complains about the prosecutor statement in closing argument that defendant "created a lot of inconsistencies for himself" in his testimony, and the prosecutor commented:

> [T]hat is the problem with not telling the truth. It is very difficult to maintain a lie because you run the risk of forgetting what you have said about the situation on prior occasions. That is what happened to the defendant.

Defendant did not object to this statement.

█ We have made it crystal clear in recent decisions that we are not going to tolerate misconduct by prosecutors in the prosecution of criminal defendants in this state. *See, e.g.,* our recent decisions in *State v. Porter*, 526 N.W.2d 359 (Minn.1995), *State v. Williams*, 525 N.W.2d 538 (Minn.1994), and *State v. Salitros*, 499 N.W.2d 815 (Minn. 1993). While the prosecutor's conduct in this case was not above reproach, we conclude, in view of the strength of the evidence against defendant and the failure of defendant to object to most of the alleged misconduct, that defendant is not entitled to a new trial on the ground of prosecutorial misconduct.

In summary, we affirm defendant's conviction of first-degree felony murder.

Affirmed.

ANDERSON, Justice (concurring specially).

I concur in the result reached by the majority, but write separately to address the dissent's concerns relating to the prosecutor's peremptory challenge. The determination of whether the prosecutor acted with discriminatory intent in exercising a peremptory challenge is essentially a factual determination to be made by the trial court. *State v. Scott*, 493 N.W.2d 546, 549 (Minn.1992). Because the trial court's determination largely turns on evaluating the credibility of the prosecutor's proffered explanation for the challenge, a reviewing court should give that determination "great deference." *Batson v. Kentucky*, 476 U.S. 79, 98 n. 21, 106 S.Ct. 1712, 1724 n. 21, 90 L.Ed.2d 69 (1986). In other words, the trial court's determination should be upheld unless it is clearly erroneous. *United States v. Johnson*, 28 F.3d 1487, 1493 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995). Unlike the dissent, I defer to the trial court's finding that the prosecutor's proffered explanations were "genuine."

Immediately after the prosecutor exercised the peremptory strike in question, the prosecutor explained that she did so because of the prospective juror's "ninth grade education level." At that time, the prosecutor explained that the prospective juror "was having a very difficult time understanding a lot of the terms that we were using." In response to the prosecutor's request to research the issue, the trial court agreed to postpone deciding whether the proffered explanation was a pretext for discrimination and agreed to hear arguments on the issue the following morning.

The following morning, the prosecutor advanced three race-neutral explanations for the peremptory strike: the prospective juror's lack of education; the prospective juror's nervous demeanor; and the prospective juror's reluctance to sit in judgment. The trial court recognized that all three of these explanations have been held to qualify as

race-neutral reasons to strike a prospective juror. *See State v. Davis,* 504 N.W.2d 767 (Minn.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 2120, 128 L.Ed.2d 679 (1994); *United States v. Hinojosa,* 958 F.2d 624, 632 (5th Cir.1992); *State v. McRae,* 494 N.W.2d 252, 257 (Minn.1992). Focusing on the first and the third of the proffered explanations, the trial court found that the prosecutor's race-neutral explanations for the challenge were "genuine."

The dissent quotes from *United States v. Biaggi,* 909 F.2d 662, 679 (2nd Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991), as authority for the proposition that "[p]ostponing consideration of a *Batson* claim * * * risks infecting what would have been the prosecutor's spontaneous explanations with contrived rationalizations." But the holding in *Biaggi* does not support the broad proposition advanced by the dissent. It is clear that the court's concern in *Biaggi* related to the *defendants'* failure to raise a *Batson* claim until after the conclusion of the trial. *See Biaggi,* 909 F.2d at 678–79. The court in *Biaggi* explained that if the defendant postpones raising a *Batson* claim "until the trial is in progress, or even completed, as in this case, [such delay] risks infecting what would have been the prosecutor's spontaneous explanations with contrived rationalizations, and may create a subtle pressure for even the most conscientious district judge to accept explanations of borderline plausibility to avoid the only relief then available, a new trial." *Id.* at 679.

In the present case, there was no "subtle pressure" to accept explanations of borderline plausibility because the prosecutor's challenge and the defendant's attendant *Batson* claim both occurred during the process of jury selection. Furthermore, contrary to the position of the dissent, the court in *Biaggi* recognized that a peremptory challenge and its attendant *Batson* claim need not occur contemporaneously with the questioning of the prospective juror, but may occur at any time during the process of jury selection. *Id.; see also State v. Kitto,* 373 N.W.2d 307, 310–11 (Minn.1985) (explaining that "the *right* to make a peremptory challenge expires either when the attorney accepts the juror or when the juror is sworn, whichever is earlier," and "[t]he period during which the trial court has discretion to permit a peremptory challenge begins when the right to make the challenge expires and continues until the entire jury has been impaneled") (emphasis added).

I agree with the dissent that a prosecutor's delay in presenting a race-neutral explanation for a peremptory strike may appear to undermine the sincerity of that explanation. But a trial court may consider all relevant factors in determining whether a prosecutor's explanations are worthy of belief. In the present case, the trial court was fully cognizant of the overnight delay and, nevertheless, concluded that the prosecutor's explanations were worthy of belief. This conclusion is not clearly erroneous, and I defer to the trial court's finding that the prosecutor's proffered explanations were "genuine."

I concur.

PAGE, Justice (dissenting).

I respectfully dissent. I dissent not because of the result in this case, although I believe it is wrong, but because of the implications today's decision has for the future. The court's decision will encourage and permit prosecutors to offer contrived explanations for challenged peremptory strikes of prospective jurors. As a result, the prohibition that prosecutors not base peremptory strikes in jury selection on race or gender, as required by the Equal Protection Clause of the Fourteenth Amendment, *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *State v. McRae,* 494 N.W.2d 252 (Minn.1992), may well be rendered meaningless.

There is a three-step process for evaluating a claim that a prosecutor has used a peremptory strike in a manner violating the Equal Protection Clause. *Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). First, the defendant must make a *prima facie* showing that the prosecutor has exercised the peremptory strike on the basis of race or gender. *Id.; J.E.B. v. Alabama ex rel. T.B.,* — U.S. ——, ——, 114 S.Ct. 1419, 1429, 128 L.Ed.2d 89 (1994). Second, and only if a

*prima facie* showing is made, the prosecutor must articulate race or gender-neutral explanations for the exercise of the peremptory strike at issue. *Hernandez,* 500 U.S. at 359, 111 S.Ct. at 1866; *J.E.B.,* — U.S. at —, 114 S.Ct. at 1429. Although that explanation "need not rise to the level justifying exercise of a challenge for cause," it must be "a 'clear and reasonably specific' explanation of [the prosecutor's] 'legitimate reasons' for exercising the [peremptory strike]." *Batson v. Kentucky,* 476 U.S. at 97, 98 n. 20, 106 S.Ct. at 1723, 1724 n. 20. Finally, the trial court has the duty to determine if the defendant has proven purposeful discrimination.[1] *Id.* at 98, 106 S.Ct. at 1724.

In this case, defense counsel objected to the prosecutor's peremptory strike of the only person of color in the jury venire, a Hispanic woman. Apparently believing that a *prima facie* case had been established, the trial court engaged in the following discussion with the prosecutor, Ms. Keena, and defense counsel, Mr. Maunu:

THE COURT: Ms. Keena, I need a race neutral reason.

MS KEENA: Her education level, her ninth grade education level. She was having a very difficult time understanding a lot of the terms that we were using.

THE COURT: I guess I didn't really get a reading that she was having trouble with the language.

MS KEENA: Well, I did. I mean the difference between consume and drinking.

MR. MAUNU: Your Honor, I believe—

MS KEENA: —Do I have to go through an entire trial explaining? I mean we won't know if she understands a term or not?

MR. MAUNU: It was my observation that she was responsive to the questions and gave the appropriate answers.

MS KEENA: After explanation, and after rephrasing the questions.

MR. MAUNU: She has lived in this country for several years and she is employed and she speaks English.

THE COURT: The objections of the defendant are sustained.

After sustaining the objection, the trial court informed the prospective juror that she would be seated on the jury. At the same time, the trial court, at the prosecutor's request "to research this because I don't know that this is the correct law on it," agreed to allow the prosecutor to research the issue overnight.

The following morning, the prosecutor, after a brief discussion of the requirements for making out a *prima facie* case, proceeded to provide the trial court with two new reasons for the peremptory strike of the prospective juror: (1) that she exhibited a nervous demeanor during voir dire; and (2) that she expressed some hesitance to sit in judgment. In addition, and much like the modern day political spin doctor, the prosecutor offered a new explanation of the initial reason given for striking the prospective juror. The new spin was that the prospective juror's education level would interfere with her ability to understand the complexities of the case. In imparting this new spin on the initial reason for striking the prospective juror, the prosecutor essentially abandoned the old spin—that she could not understand English. The trial court, finding that the prospective juror's hesitance to sit in judgment and that the new spin—her alleged inability to understand the complexities of the case—were valid race-neutral reasons for exercising the peremptory strike, reversed its earlier ruling, and struck her.

The concern I have in this case is the prosecutor's delay in articulating her legitimate reasons for the peremptory strike after it was challenged by the defendant. I believe that it was error for the trial court to have considered the new reasons and the new spin given by the prosecutor the day after the peremptory strike was exercised.[2]

1. Here, review of the trial court's finding was made unnecessarily difficult by the trial court's failure to closely follow the three-step process.

2. Had the trial court reversed itself based on its reconsideration of the reason and explanation given the day before, our review would be limited to whether its determination was clearly erroneous. On the facts before us, such a determination would not have been clearly erroneous. *State v. James,* 520 N.W.2d 399, 404 (Minn.

*Batson* requires that when a prosecutor's peremptory strike of a prospective juror is challenged, the prosecutor must give a "clear and reasonably specific" explanation of his or her "legitimate reasons" for exercising the strike.[3] 476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20. "Postponing consideration of a *Batson* claim * * * risks infecting what would have been the prosecutor's spontaneous explanations with contrived rationalizations." *United States v. Biaggi*, 909 F.2d 662, 679 (2d Cir.1990)[4] (citing *United States v. Tunnessen*, 763 F.2d 74, 78 (2d Cir.1985), for the rule that a trial court must contemporaneously explain its grant of a continuance in order "to guard against [the] risk that [the] district judge 'may simply rationalize his action long after the fact' ").

In this case, at the time the peremptory strike of the prospective juror was challenged, the prosecutor offered only one explanation of the reason for the peremptory strike: her inability to understand and comprehend English. That explanation was spontaneous and appears to have been a clear and reasonably specific explanation of the prosecutor's legitimate and genuine reason for the peremptory strike. On the record before us, the prosecutor's failure to promptly articulate any other reasons or explanations convinces me that there were none. The fact that the prosecutor provided a new explanation along with different reasons for the peremptory strike the next morning implies that even if they would have justified the peremptory strike, they were not the prosecutor's legitimate or genuine reasons for exercising the peremptory strike at the time it was exercised.

The purpose behind *Batson* is to ensure that the reasons relied on to exercise a peremptory strike are legitimate, race-neutral, and nonpretextual. The goal of the three-

step procedure outlined in *Batson* is to identify the prosecutor's genuine reasons for the strike, not unrelied-upon justifications for the strike. As the Supreme Court has recently noted, " 'proving that the same decision would have been justified * * * is not the same as proving that the same decision would have been made.' " *McKennon v. Nashville Banner Publishing Co.*, —— U.S. ——, ——, 115 S.Ct. 879, 885, 130 L.Ed.2d 852 (1995) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989) (plurality opinion)).

Today's decision allows prosecutors to engage in mischief that will interfere with the achievement of the goal of identifying their genuine reasons for exercising peremptory strikes and, in the process, undermines the protections guaranteed by the Equal Protection Clause, as set out in *Batson*.

---

1994). That, however, is not what the trial court did.

**3.** As noted, *Batson* also makes clear that the reasons "need not rise to the level justifying exercise of a challenge for cause." 476 U.S. at 97, 106 S.Ct. at 1723. Indeed, in my view, like the discharge of an at-will employee, which may be justified by any reason or no reason, so long as it is not an illegal reason, the peremptory strike of a juror may be made for any reason, so

long as it is not a constitutionally-impermissible reason or pretext for a constitutionally-impermissible reason.

**4.** While the issue addressed in *Biaggi* is different than the one before us, the principle that a delay in the prosecutor's spontaneous explanation "risks infesting [those explanations] with contrived rationalizations" is nonetheless applicable.