**STATE of Minnesota, Respondent,**

v.

**Robert Marlyn TAYLOR, Appellant.**

No. C9–01–741.

Supreme Court of Minnesota.

Aug. 30, 2002.

Michael C. Davis, Special Asst. State Public Defender, St Paul, for Appellant.

Michael A. Hatch, Minnesota Atty. Gen., St. Paul, Amy Klobuchar, Hennepin County Atty., Michael Richardson, No. 91388, Asst. County Atty., Minneapolis, for Respondent.

## OPINION

ANDERSON, RUSSELL A., Justice.

Appellant Robert Marlyn Taylor was convicted of premeditated first-degree murder for the killing of John Turner and sentenced to life in prison. In this direct appeal, he argues *inter alia* that the indictment should have been dismissed due to prosecutorial misconduct during grand jury proceedings, that the state's peremptory strike of a juror from the venire constituted purposeful racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, that the district court improperly admitted the recording of a 911 call into evidence, and that the evidence was insufficient to convict him. We affirm.

John Turner ran an antique business from his home in south Minneapolis, which was filled with antiques and collectibles, including antique tools. Turner also owned the house next door, which he rented to appellant's estranged wife and children. Appellant sometimes lived with his wife and did occasional odd jobs for Turner. On the evening of December 24, 1999, Turner had his daughters and a friend over for dinner. Turner planned to meet another friend for breakfast the next morning, but when the friend telephoned at breakfast time, he reached Turner's answering machine. When Turner failed to arrive at his wife's home[1] for Christmas dinner, his wife and daughter drove to his home and found his front door unlocked, several lights on inside, and the kitchen faucet running. They found Turner's body in a pool of blood, in the same clothing he wore the previous evening at dinner. Turner's wallet was missing.

Police noted signs of a struggle around the body. A round-handled metal "die stamp"[2]—approximately 4 inches long and weighing 5½ pounds—was found near the body. Blood found on the die stamp matched the DNA profile of Turner. A medical examiner concluded that Turner received eight blows to the head and face with a heavy object, that blunt force trauma caused Turner's death, and that the die stamp could have been the death weapon. Nearly every bone in Turner's skull was fractured. According to the medical examiner, the eight blows could have been accomplished within seconds, and the time of death was between 7:30 p.m. and 7:30 a.m. Turner had wounds on both hands that could be consistent with defensive wounds.

Appellant's sister Edith Taylor testified that appellant spent several hours cooking and drinking alcoholic beverages at her home in St. Paul on the afternoon of December 24. Appellant's sister Brenda Adams testified that around 9 p.m. that evening appellant had a few drinks at her home in St. Paul but that he was not intoxicated. Brenda and appellant argued

---

1. Turner and his wife had been separated for approximately ten years.

2. A "die" includes, "any of various tools or devices for imparting a desired shape, form, or finish to a material" or for impressing an object or material. *Webster's Third New International Dictionary* 628 (1993). Turner had a workshop with tools in the house close to the location of his body.

over a family matter and appellant left. Soon Edith arrived at Brenda's house, intoxicated. Brenda asked Edith to leave, and Edith said she was going to go back home and, according to Brenda, "punch [appellant] in the head." Edith returned to her home to find appellant sleeping. Appellant woke up and argued with Edith, and Edith called 911 at approximately 12:50 a.m. Over the objection of defense counsel the recording of the 911 call was played for the jury, including the following exchange:

Edie: Stop it, Bobby . . .

Bobby: You'll get it to . . .

Edie: Stop don't try to cut me stop. Stop.

Male voice: Don't try to cut her, see you're drunk(commotion) (inaudible) * * *.

Bobby: I don't give a f——k about Brenda, f——k Brenda, I told you I've been having a dream, Brenda f——k me (inaudible) * * *.

* * * *

Edie: . . . you hurt her feelings that was wrong.

Bobby: I'll go to Brenda's house. I'll slap Brenda's f——king face you know why?

Edie: You hurt Jenae's feelings . . . Brenda's feelings.

Bobby: (inaudible) F——k Jenae . . . F——k Jenae.

Later on the same tape, Edith and the 911 operator had this exchange:

Operator: Is he drunk?

Edie: Yes.

Operator: And you want him out of your home?

Edie: Yes, right away.

Operator: Okay. Has he been abusive at all Edith?

Edie: Yes.

Operator: Has he hit you?

Edie: Yes.

Operator: Okay with his hands or with another item? Hands?

Edie: Yes.

Operator: Anything else?

Edie: No.

Police were dispatched to Edith's home at 12:50 a.m., and appellant left after some protest. As he walked away he told police he was going to Minneapolis. Meanwhile, Brenda went to her father's home sometime after midnight to bring him his Christmas present and stayed at her father's house for an hour. Shortly after her arrival appellant knocked on the door. He identified himself, asked to be admitted, and said that he needed some help, but his father refused to admit him.

After discovering Turner's body, police canvassed Turner's neighborhood, initially speaking with appellant at his wife's home. Appellant told police that he went to Turner's house at about 2:30 a.m., Turner let him inside, and he unsuccessfully tried to call his wife. Appellant said he left after speaking with Turner for about ten minutes. In a second interview that day appellant told police he spent Christmas Eve at his sister's home and returned to his wife's home at about 2 a.m. but could not unlock the door. Seeing lights on in Turner's house, he asked Turner for a key to his wife's home, but Turner refused to give appellant a key because of recent marital problems between appellant and his wife. Appellant said that he went from Turner's house to the home of his friend Marion Anderson and stayed there most of the next day until he returned to his wife's home. During a third interview appellant added that he left St. Paul around 1:30 a.m. on a bus to Minneapolis and arrived at his wife's home 45 minutes to an hour later.

Marion Anderson initially denied that appellant had been at his home on Christmas morning but later told police that appellant arrived at his house between 5 a.m. and 6 a.m., appeared somewhat intoxicated, and wore a black leather jacket and bib overalls over blue jeans. The two men drank alcoholic beverages most of the day, and appellant bought more beer a few times using money he had in his wallet.

During their investigation of the crime scene, police collected a cigarette butt from Turner's kitchen sink. Turner's daughter testified that she cleaned his kitchen after dinner on Christmas Eve, that nothing was in the sink after she cleaned, and further that she would not have left anything in the sink. Appellant told police that he had smoked a Newport cigarette while at Turner's house and may have run water over it and put it in the garbage. DNA on the recovered cigarette matched neither appellant nor Turner, however.

During a fourth interview at the police station appellant said that on Christmas Eve he wore the same jeans he was wearing for the interview. Police asked whether he owned bib overalls, and appellant admitted he did, that he could have been wearing them on Christmas Eve, and that his two pairs of overalls were at his wife's house. During a break in the interview, police observed appellant brush the right sleeve of his leather jacket, then wet his finger and wipe the sleeve. Following the interview appellant was arrested. The leather jacket and a pair of overalls found at appellant's wife's house contained blood-stains. According to experts at trial the stains on the overalls were the result of "impact spatter," the overall's bloodstains matched the DNA profile of Turner, and the DNA profile "would not be expected to occur more than once among unrelated individuals in the world population." [3]

A grand jury returned an indictment charging appellant with three counts of homicide: first-degree premeditated murder under Act of May 22, 2002, ch. 401, art. 1, sec. 15, 2002 Minn. Sess. Law Serv. 1204–05 (West) (amending Minn.Stat. § 609.185(1)), first-degree felony-murder under Act of May 22, 2002, ch. 401, art. 1, sec. 15, 2002 Minn. Sess. Law Serv. 1204–05 (West) (amending Minn.Stat. § 609.185(3)), and second-degree intentional murder under Minn.Stat. § 609.19, subd. 1(1) (2000). Appellant moved to dismiss the indictment, arguing that prosecutors improperly discussed trial strategy with grand jurors, made improper summations, gave improper instructions, offered evidence of prior bad acts committed by appellant (allegations of violence between appellant and his wife and between appellant and his family on the night of the murder), and failed to disclose exculpatory evidence to the grand jury. The district court denied appellant's motion.

Appellant's first trial ended in a mistrial. During jury selection for appellant's second trial, the state exercised a peremptory strike of one potential juror and the defense made a *Batson*[4] challenge, arguing that the strike constituted purposeful racial discrimination in violation of the Equal

3. We deny appellant's motion to reopen this appeal to argue that the DNA evidence in this case was admitted erroneously under the recent decision of the court of appeals in *State v. Traylor*, 641 N.W.2d 335 (Minn.App.), *rev. granted* (Minn. May 14, 2002). Appellant may raise this issue in a postconviction petition under Minn.Stat. ch. 590 (2000).

4. In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court established a procedure for courts to analyze an allegation that a peremptory strike of a juror was motivated by racial bias.

Protection Clause of the Fourteenth Amendment. The district court denied appellant's challenge. The jury found appellant guilty of premeditated first-degree murder.

Appellant asks us to reverse his conviction for several alleged errors made by the district court: (1) denying appellant's motion to dismiss the indictment, (2) denying appellant's *Batson* challenge, and (3) admitting the 911 tape and the die stamp into evidence. Appellant also argues that the circumstantial evidence was insufficient to sustain a guilty verdict for premeditated first-degree murder. In a pro se supplemental brief appellant raises several additional claims, including prosecutorial misconduct and that the state's alleged failure to collect blood at the scene of Turner's murder cast doubt on the verdict.

## I.

■ A presumption of regularity attaches to an indictment, and "it is a rare case where an indictment will be invalidated." *State v. Inthavong*, 402 N.W.2d 799, 801 (Minn.1987). Because of this presumption, a defendant bears a heavy burden when seeking to overturn an indictment. *State v. Scruggs*, 421 N.W.2d 707, 717 (Minn.1988). However, "[a]n indictment should be dismissed if the prosecutor knowingly engaged in misconduct that substantially influenced the grand jury's decision to indict and if a reviewing court gravely doubts that the decision to indict was free of any influence of the miscon-

duct." *State v. Greenleaf*, 591 N.W.2d 488, 498 (Minn.1999).

■ Appellant first argues that the prosecutor improperly asked the grand jury to indict on a lesser-included offense in order to gain a strategic advantage at trial. His contention stems from the prosecutor's answer to a grand juror's question about lesser-included offenses, in which the prosecutor stated that the state prefers to have a jury instructed on lesser-included offenses.[5] The discussion of lesser-included offenses was initiated by a grand juror, however, and immediately after noting the state's preference to have lesser-included offenses submitted to the jury, the prosecutor stated, "But you shouldn't make a decision based on what is convenient for us or what we like to have happen." Thus, there was no intentional misconduct aimed at subverting the independence of the grand jury. Moreover, appellant was ultimately acquitted on the lesser-included charge.

■ Second, appellant argues that the prosecutors made inappropriate arguments to the grand jury to secure an indictment. The prosecutor's opening statement provided an overview of the expected testimony and helped determine whether the grand jurors knew anything about the case. The district court found the statement was given in a "non-argumentative vein." The court concluded that the closing statement, in which the prosecutor explained how the jurors could make certain inferences from the evidence, was given in

---

5. At the grand jury proceedings a juror asked whether, if the grand jury found probable cause for premeditation, there was any reason to also indict on the second-degree murder count. The prosecutor first explained the concept of a lesser-included offense, and then stated:

And generally speaking, in cases like this, the jury—we prefer for the jury to hear

those and we ask the court to submit those to the jury. And that's part of why we include that in your finding here.

But you shouldn't make a decision based on what is convenient for us or what we like to have happen. You should make your decision based upon the facts as you find them to be applied to the law as we've instructed you.

a "somewhat argumentative manner."[6] However, because the prosecutor repeatedly reminded the grand jurors of their independence in deciding if and how to indict, the prosecutor's language in the arguments did not necessitate dismissing the indictment. See *Greenleaf,* 591 N.W.2d at 498–99.

■ Appellant also argues that the prosecutors improperly instructed the grand jury that they had not heard all of the available evidence. A grand juror asked about an instruction and in response to the juror's question the prosecutor explained that the grand jury should evaluate the chances of a conviction considering that the grand jury does not hear all of the evidence presented at trial. However, the grand jury was repeatedly told it was their decision whether probable cause existed based on the evidence presented to them. Therefore, the prosecutor's explanation would not have substantially influenced the grand jury's independence.

■ Finally, appellant argues that the indictment should be dismissed because the prosecutors prejudiced the grand jury by presenting evidence of prior bad acts unrelated to Turner's death, including evidence of violence between appellant and his wife and the heated arguments between appellant and his sisters on Decem- ber 24. However, that evidence cannot be considered prior bad acts—on the contrary, the evidence was part of a course of conduct leading to Turner's murder. Previous domestic violence between appellant and his wife explained why he didn't have a key for her home, why appellant was in Turner's home that night, and, most importantly, why Turner would have refused him the key. In addition, the state's theory was that appellant's rage over Turner's refusal to give him the key provided a motive for the murder. Evidence of appellant raging at the homes of his family members shortly before Turner was murdered show his state of mind around the time of the crime. Therefore, evidence of past violence between appellant and his wife and arguments with his family members was relevant, and the district court properly denied appellant's motion to dismiss the indictment on this basis.

## II.

■ Appellant argues next that the state's peremptory strike of juror 25 violated his right to a fair trial under *Batson.* The use of peremptory challenges to exclude persons from a jury solely on the basis of race is prohibited by the Equal Protection Clause. *Batson,* 476 U.S. at 89, 106 S.Ct. 1712; U.S. Const. amend. XIV, § 1.[7] Whether there is racial discrimina-

---

**6.** Several times the prosecutor used arguably argumentative language when addressing the grand jury. For instance she stated: "And from this record you can infer several things with respect to motive. You could infer that Mr. Taylor was angry and drunk and upset with Mr. Turner because Mr. Turner would not do what he wanted him to do."

Later the prosecutor stated:

Perhaps it's possible you could find that maybe initially he didn't have a premeditated mind state to kill. But that during the course of these wounds, repeated wounds, and the time between the wounds being inflicted, there certainly is time for him to form an intent to kill, I suggest to you, from these facts. Again, you know, you make your own decisions here, but you could, there's an inference there that would lead you there.

**7.** Appellant also claims that under the Minnesota Constitution and *State v. Russell,* 477 N.W.2d 886, 889 (Minn.1991), there must be a legitimate purpose to the governmental action and a "reasonable connection between the actual, not just the theoretical, effect of the challenged classification and the * * * goals," which warrants a new trial. Appellant fails to explain how application of this standard would differ from application of the federal equal protection test as developed un-

tion in the exercise of a peremptory challenge is a factual determination to be made by the district court and is entitled to great deference on review. *See State v. James*, 520 N.W.2d 399, 403–04 (Minn. 1994). The district court's determination will not be reversed unless it is clearly erroneous. *Id.* at 404.

The Supreme Court in *Batson* established a three-step process for a district court to determine whether a peremptory challenge is motivated by a racially discriminatory intent. First, the defendant must establish a prima facie case of purposeful discrimination. *Batson*, 476 U.S. at 96, 106 S.Ct. 1712. In order to establish a prima facie case, the defendant must show that one or more members of a racial group have been peremptorily excluded from the jury and that circumstances of the case raise an inference that the exclusion was based on race. *State v. Stewart*, 514 N.W.2d 559, 563 (Minn.1994). Here the district court ruled that a prima facie case was made, citing juror 25's race (biracial with one African American parent and one Caucasian parent) and the fact that she was the first minority juror questioned. We do not dispute the district court's finding that a prima facie case was made.

The second step of a *Batson* analysis shifts the burden to the state to articulate a facially race-neutral reason for the peremptory strike. *Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *State v. Henderson*,

620 N.W.2d 688, 703 (Minn.2001). Relying upon information from the juror's questionnaire and voir dire testimony, the state offered the following as race-neutral reasons for the peremptory strike: the juror's age (19); the juror's hospitalization and medication for depression; the juror's "indifference" toward police; the fact that her uncle had been killed violently; the fact that the juror's two ex-boyfriends had had significant contact with the criminal justice system; the juror's having heard stories of police tampering with evidence; the juror's belief that DNA evidence should not be determinative of guilt; and the fact that the juror believed she would be determining someone's " 'life and freedom.' " [8]

The district court ruled that the state had provided several race-neutral reasons for striking juror 25: the juror's age, her attitude toward police evidence tampering, her lack of faith in DNA evidence, her uncle who was killed violently, and her ex-boyfriends in prison. However the court ruled that two of the reasons—hospitalization and medication for depression and indifference toward police—proffered by the state were not "race-neutral" on the record. As to juror 25's treatment for depression, the court stated "the record is not clear that [the juror] is currently on medication or when she was hospitalized and I do not accept that reason as a race-neutral basis for having struck her without any questioning at all." Regarding her indifference toward police, the court noted that several jurors had expressed similar sentiments about police, and thus the rea-

der *Batson*. Therefore, we decline to separately apply the Minnesota Constitution.

8. The jury questionnaire included the question "what are your general feelings about police officers" and provided the choices "positive," "negative," or "other." Juror 25 checked "other" and wrote that her feelings were indifferent and that police "can be there to help you or to hurt you." In voir dire she

elaborated: "[police are] either there to help you * * * to serve justice * * *, otherwise they can turn, and you hear all these stories about how some police officers, you know, tamper [with] evidence and stuff like that, and I believe that my answer came from just hearing things over the years about police officers."

son "would not be, on this record, enough to have said that the reason is raceneutral [sic]."

The district court failed to follow the proper procedure at step two of the *Batson* analysis—that is, rather than determining whether each of the prosecutor's reasons was race-neutral *on its face,* the district court analyzed whether the reasons were credible in light of the record and response to testimony of other jurors. An explanation provided by the prosecutor does not, at this stage, have to be "valid" in the sense of establishing a reasonable basis for a strike. *See State v. McRae,* 494 N.W.2d 252, 254 (Minn.1992). Unless discriminatory intent is *inherent* in the prosecutor's explanation, the reason offered will be deemed race-neutral. *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769 (quoting *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion), and *id.* at 374, 111 S.Ct. 1859 (O'Connor, J., concurring in judgment)).

Because the district court did not apply the proper *Batson* analysis at step two, we need not defer to the finding that the reasons were not facially race-neutral. With respect to the juror's treatment for depression, we fail to see how that reason can be anything but race-neutral. The district court appears to have been concerned that the prosecutor did not ask additional questions of the juror to establish the relevance of the juror's depression to her capacity to serve as a juror.[9] However, questions the state did not ask cannot form the basis of a finding that the

reason offered was not race-neutral. *Henderson,* 620 N.W.2d at 704. At most, questions not asked go to the third prong of *Batson,* whether the state's racially-neutral reason constitutes pretext. *Id.*

With respect to the juror's indifferent attitude toward police, we question whether it is even necessary or appropriate to consider indifference toward a category of witnesses as a conceivable basis to strike a juror. Indifference or neutrality is exactly the trait we desire in jurors, *see State v. Greer,* 635 N.W.2d 82, 87 (Minn. 2001), and therefore the prosecutor's reliance in part on the juror's indifference to strike her is nonsensical. However, while an indifferent attitude towards police is not a cognizable basis to strike a juror, under prong two of *Batson* our only inquiry is whether the state's reason is race-neutral, and we can conclude only that indifference towards police is race-neutral. Whether indifference towards police is pretextual is the real question.

We proceed then to step three of the *Batson* analysis, in which the district court, considering all the evidence, determines whether the defendant carried his burden of proving that the peremptory strike was motivated by racial discrimination and that the proffered reasons were merely a pretext for the discriminatory motive. Appellate courts give considerable deference to the district court's finding on the issue of the prosecutor's intent because the court's finding typically turns largely on credibility. *See Hernandez,* 500 U.S. at 366–69, 111 S.Ct. 1859 (plurality

---

9. The entirety of the district court's finding in this regard is as follows:

I do say, however, that the record is not clear that [the juror] is currently on medication or when she was hospitalized and I do not accept that reason as a race-neutral basis for having struck her without any questioning at all.

It's true her treatment may have been more significant than others, but we don't know that. It may also have been equally as significant as others. We just don't know.

opinion); *State v. Scott,* 493 N.W.2d 546, 549 (Minn.1992) (noting whether prosecutor acted with discriminatory intent is essentially a factual determination that the district court makes).

■ Here, the court ruled that appellant had not carried his burden of proving purposeful discrimination and denied the *Batson* challenge. Appellant claims that because the district court found two reasons were not race-neutral, a new trial is warranted. However, the district court ultimately concluded that appellant had not carried his burden of proof that the reasons offered were a pretext for discrimination. While additional explanation of the court's finding would have been helpful, it is reasonable to conclude that the prosecutor was not motivated by racial discrimination. Depression and indifference toward police do not appear in this case to have been pretextual reasons for discrimination. The prosecutor might well have been concerned that the juror's mental health, even if she was not currently on medication, might adversely affect her ability to serve as a juror. And while indifference toward police may be an absurd reason to strike a juror, in the context of the remaining non-discriminatory reasons for striking the juror presented in this case, we cannot conclude that the absurdity indicates an intent to discriminate.[10] In another case, such as where the other reasons given were likewise absurd, we would not hesitate to conclude that the opponent of the strike had met the burden of establishing pretext.

■ We note that if the basis for the challenge given by the prosecutor is one that will result in the disproportionate exclusion of members of a certain race, the trial court may consider this basis as relevant in determining whether the facially-neutral reason given by the prosecutor is offered to mask a discriminatory intent. *See Greenleaf,* 591 N.W.2d at 500. Appellant implies, but does not allege specifically, that the reasons given in this case for the strike result in a disproportionate exclusion of members of a certain race. We recently made clear, however, that disparate impact is simply one of the relevant considerations for the district court bearing on pretext and is therefore not determinative of pretext. *State v. Martin,* 614 N.W.2d 214, 223 (Minn.2000) (citing *Greenleaf,* 591 N.W.2d at 500, and *Hernandez,* 500 U.S. at 362 (plurality opinion), 374, 111 S.Ct. 1859 (O'Connor, J., concurring in judgment and stating that disparate impact analysis is not appropriate for *Batson* challenge)). Thus, we conclude on the record before us that the district court's determination that there was no purposeful discrimination was not clearly in error and must be affirmed.[11] *See, e.g., Hernandez,* 500 U.S. at 359–70, 111 S.Ct. 1859.

10. We note that the concurrence/dissent's conclusion that indifference toward police is a "fantastic" explanation for a peremptory strike and a pretext for discrimination is made summarily. Under *Batson* and its progeny, appellant must carry his burden of proving that a facially-neutral reason is a pretext for discrimination. The district court found that appellant failed to identify evidence that proved the facially-neutral reason was pretextual. In light of the deference we must give to the district court's finding under *Batson,* and of our own examination of the record, we find the conclusory assertion made by the concurrence/dissent legally deficient to support a reversal.

11. Appellant urges this court to adopt a rule that when a prosecutor provides both a racially discriminatory and a race-neutral reason for a peremptory strike, the strike should be overruled because the discriminatory reason "taints" any other neutral reason for the strike. *See, e.g., State v. Lucas,* 199 Ariz. 366, 18 P.3d 160, 163, *rev. denied* (Ariz. May 23, 2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 506, 151 L.Ed.2d 415 (2001); *Payton v. Kearse,* 329 S.C. 51, 495 S.E.2d 205, 210

### III.

Appellant's next argument is that he was denied a fair trial when the district court admitted into evidence a recording of the 911 call made by appellant's sister Edith in the early hours of December 25. The tape of the 911 call was played during the testimony of a police officer who identified the voices of Edith Taylor and appellant on the tape. Edith testified that she had listened to the 911 tape in the prosecutor's office and adopted the substance of the call during her testimony, although she had no independent recollection of the events portrayed in the tape.[12]

We review the admission of the 911 tape into evidence with great deference for the district court's ruling and will not overturn the ruling absent a clear abuse of discretion. *See State v. Kelly*, 435 N.W.2d 807, 813 (Minn.1989). The

district court initially admitted the 911 tape only to impeach Edith's testimony, and ruled that hearsay objections were cured by the "present sense impression" exclusion from hearsay. *See* Minn. R. Evid. 801(d)(1)(D) (providing statement is not hearsay if declarant testifies and statement describes or explains an event or condition made while the declarant was perceiving the event or condition or immediately thereafter). The district court also noted that the 911 tape could be admitted as an "excited utterance" exception to hearsay under Minn. R. Evid. 803(2) (providing statement relating to a startling event or condition made while declarant was under the stress of excitement caused by the event or condition is not excluded by hearsay rule). Later, the court vacated the decision to restrict the use of the tape to impeachment but noted without elaboration that the tape was still admitted into

(1998). The state responds that several federal courts have adopted a "dual motivation" analysis, where a peremptory strike motivated by a racially discriminatory reason is allowed if the state proves by a preponderance of the evidence that the strike would have been exercised even in the absence of the discriminatory motivation. *See, e.g., United States v. Tokars*, 95 F.3d 1520, 1533–34 (11th Cir.1996). We need not rule on this issue because both "taint" and "dual motivation" analyses are triggered by a finding of a racial pretext. In light of our holding that sustains the district court's determination that there was no purposeful discrimination, neither approach is pertinent here. Although we consider indifference towards police in the context of other reasons given for the peremptory strike, we do so only to determine whether the suspect reason (indifference) is so absurd as to indicate pretext for racial discrimination and not to suggest that the other reasons establish a "dual motivation." To analyze either the "taint" or "dual motivation" approach without the issue before us would be to render an advisory opinion, and thus we decline to respond to the concurrence/dissent's support of the "taint" approach.

12. Appellant claims that in his first trial, the district court excluded the 911 call from evidence as part of an omnibus order. Appellant further argues that under the comment following Minn. R.Crim. P. 11—which states "the trial judge, except in extraordinary circumstances will adhere to the findings and determinations of the Omnibus Hearing judge"—the ruling of the first court should have remained in place during the second trial, absent extraordinary circumstances.

First, comments to the Rules of Criminal Procedure are authored by the Criminal Rules Advisory Committee, not this court, and are not binding on the court. Minn. R.Crim. P., introductory cmt. In addition, appellant has not submitted a copy of the court's omnibus ruling in the first trial. On appeal, the appellant is responsible for providing the court with an adequate record. *Custom Farm Serv., Inc. v. Collins*, 306 Minn. 571, 572, 238 N.W.2d 608, 609 (1976). An appellate court may not base its decision on matters outside the record on appeal. *Thiele v. Stich*, 425 N.W.2d 580, 582–83 (Minn.1988). Thus, we cannot accept appellant's assertion that the ruling excluding the 911 tape was part of an omnibus order or rule on the legal issue raised.

evidence. As the jury deliberated, the court made a final record regarding its ruling on the 911 tape, noting that in addition to the rulings made earlier, appellant's statements on the tape were admissible pursuant to the "admission by party-opponent" hearsay exclusion. *See* Minn. R. Evid. 801(d)(2)(A) (providing statement is not hearsay if it is a party's statement and offered against the party). Finally, the court noted that appellant's statements on the tape were relevant to appellant's state of mind during a time close to Turner's murder.

The district court did not abuse its discretion in concluding that the 911 tape was relevant evidence. The tape provided evidence of appellant's state of mind near the time of the murder and undermined the defense theory that appellant was calm during the family dispute. As to the hearsay objection to the tape, the district court properly ruled that the tape qualified as a present sense impression under Rule 801(d)(1)(D), an excited utterance under Rule 803(2), and an admission by a party-opponent under Rule 801(d)(2)(A).

 Appellant argues that the tape was extremely prejudicial because it revealed him making threats against his sister Brenda and portrayed him as man in a rage disproportionate to the triggering event. He argues that because the state's theory of the case was that he killed Turner in a rage over not getting the house key—a rage disproportionate to the triggering event—the tape prejudiced the jury against him. Under Minn. R. Evid. 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. The statements on the tape were highly probative of appellant's state of mind and behavior on the night of December 24 and in early morning of December 25. The prejudice stemming from the

tape was diminished, however, because Edith, Brenda, and an officer who responded to Edith's 911 call all testified that appellant was belligerent on the evening of December 24 and in the early morning hours of December 25, and thus the substance of the tape was otherwise before the jury. We conclude that the district court did not abuse its discretion by admitting the 911 tape into evidence.

 In his pro se brief appellant also argues that the district court erred in admitting the die stamp into evidence. Appellant claims that the die stamp was irrelevant because the medical examiner had not determined that it was the murder weapon and because appellant had not been connected to the die stamp in any way. At trial, defense counsel did not object to admitting the die stamp into evidence. Failure to object to the admission of evidence generally constitutes waiver of the right to appeal on that basis unless appellant shows that the admission of the evidence was plain error affecting substantial rights. *Van Buren v. State*, 556 N.W.2d 548, 551 (Minn.1996). Evidence is relevant if it has "any tendency to make the existence of any fact" more probable than it would be without the evidence. Minn. R. Evid. 401.

Several facts establish the die stamp's relevancy. First, the appearance of Turner's blood on the die stamp had a tendency to show that the die stamp was the murder weapon. Second, the medical examiner testified that the murder weapon was a heavy man-made object, a fact that is supported by the nature of Turner's injuries. Third, given the array of antique tools at Turner's home, the assailant likely found the die stamp in Turner's house, which fits the state's theory of the assault. Therefore, we cannot conclude that the die stamp was erroneously admitted, much less that its admission was plain error.

Appellant is not entitled to a new trial based on the district court's evidentiary rulings.

## IV.

 Appellant's next argument is that the evidence at trial was insufficient as a matter of law to support the guilty verdict for first-degree premeditated murder. In considering a sufficiency of the evidence claim, our review is limited to determining whether the evidence, when viewed in the light most favorable to the conviction, was sufficient to allow the jurors to reach the verdict they did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and for the requirement of proof beyond a reasonable doubt, could reasonably conclude the defendant was proven guilty of the charged offense. *State v. Alton*, 432 N.W.2d 754, 756 (Minn. 1988). We must assume the jury believed the state's witnesses and disbelieved any evidence to the contrary. *See State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989).

 In this case, there was no direct evidence of appellant's guilt—the state's case was built on circumstantial evidence only. Circumstantial evidence must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt. *State v. Jones*, 516 N.W.2d 545, 549 (Minn.1994). Appellant argues that several unanswered questions break the chain of circumstantial evidence such that the evidence does not point un-

erringly to appellant. Specifically, appellant notes that the state could not determine precisely when the victim's blood was deposited on appellant's clothing,[13] and the state's DNA analyst stated that the blood could have been on the clothing for a year or more. Appellant also notes the cigarette butt found in Turner's sink had neither the DNA of appellant nor the victim on it.

 To successfully challenge a conviction based upon circumstantial evidence, a defendant must point to evidence in the record that is consistent with a rational theory other than guilt. *State v. Ostrem*, 535 N.W.2d 916, 923 (Minn.1995). However, "possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable." *Id.*

Appellant's rational theory other than guilt is the same as the assertion given to police—that after speaking with Turner for about 10 minutes and realizing that entry into his wife's home was not possible, he walked to Marion Anderson's house. In this case, appellant's theory is unreasonable because it fails to explain the time lag between the time he met with Turner, between 2 and 3 a.m., and the time he arrived at Marion Anderson's house, less than two miles away from Turner's home, between 5 and 6 a.m. Appellant's theory also does not explain how Turner's blood got on his clothing worn on the night of the murder. He claims there are "any number of scenarios" to explain the presence of Turner's blood on his clothing. However, appellant does not identify any of those scenarios or provide a rational

---

**13.** In his pro se supplemental brief, appellant appears to claim that the state failed to establish either that it collected blood samples from the crime scene or that it maintained proper chain of custody of the samples collected. There is no record of an objection to the evidence of blood spatter actually presented at trial, however. Appellant did cross-examine the personnel responsible for handling the evidence, and therefore appellant's allegations regarding the chain of custody were before the jury.

theory for how the blood got there. *See, e.g., State v. Gates,* 615 N.W.2d 331, 338 (Minn.2000) (holding that where defendant's theory is contradicted by physical and testimonial evidence, circumstantial evidence that leads directly to guilt is sufficient to convict). In light of the evidence taken as a whole, appellant's rational theory other than guilt does not require reversal of the jury verdict.

 Appellant also specifically challenges the sufficiency of the evidence of premeditation. The jury had before it evidence that appellant was in an intoxicated, angry state on the evening of the murder. He admitted to police that he went to Turner's home to ask for a key to his wife's home and was refused the key. Blood matching Turner's DNA was found on both the jacket and the overalls appellant admitted he was wearing the night of the murder. Turner was brutally killed, having received eight blows to the head from a heavy object.

In this case, the number of blows shows that the act was intentional, and the use of a heavy object on the victim's head shows that the assailant intended to kill. *See State v. Hare,* 278 Minn. 405, 408, 154 N.W.2d 820, 822 (1967) (holding inference of premeditation permissible from multiple gun shots). In addition, evidence that Turner refused to give appellant a key to his wife's home suggests a motive. On these facts, the jury could find beyond a reasonable doubt that appellant killed Turner with premeditation and intent. Therefore we conclude that the evidence was legally sufficient to sustain appellant's conviction for first-degree premeditated murder.

## V.

 Appellant makes several additional claims in a pro se supplemental brief and an addendum thereto. Most of the claims allege that the prosecutor misstated the evidence or otherwise asked the jury to speculate. Even if we were to agree with appellant that the prosecutor's statements misstated the evidence, the jury was instructed that they should rely on their own recollection of the evidence and not the attorney's argument. We presume that the jury followed the court's instruction, *State v. Ferguson,* 581 N.W.2d 824, 835 (Minn.1998), and therefore decline to order a new trial on this basis.

 Appellant also claims that the prosecutor committed misconduct during closing arguments by using sympathy and prejudice to influence the jury. In appellant's closing argument he suggested that police may have tampered with some evidence. In the state's rebuttal, the prosecutor argued that the suggestion of evidence tampering was unsubstantiated, making reference to the prosecution of O.J. Simpson.[14] The defense did not object to this statement at trial. Nevertheless appellant now argues that by mentioning O.J. Simpson, the prosecutor may have caused the jury to associate appellant with the Simpson case and that the reference may have influenced a juror who perhaps felt Simpson had escaped liability for his alleged crimes.

---

14. The prosecutor argued:

But you know the other effort at speculation is far, far, far more serious, because what she's telling you is that two veteran police officers who didn't know [Taylor], who had nothing at stake, this is no celebrity here, let's be straight. This is no O.J. She might want you to think O.J., but this is no O.J. This is Robert Taylor, and what she's telling you is the police in this case had the opportunity and the ingenuity and the interest and the criminal intent, let's be clear, it would be criminal intent for these officers to do this, to tamper with evidence in this case. That's what she's telling you.

We have stated that "[n]o purpose is served by comparing [a defendant] to another charged with a notorious crime other than to attempt to impassion the jury * * *." *State v. Thompson*, 578 N.W.2d 734, 743 (Minn.1998) (discussing prosecutor's argument that defendant was going to kill his victim "like O.J."). However, even if the reference to Simpson constituted misconduct in this case, prosecutorial misconduct does not, in and of itself, require a new trial. *Scruggs*, 421 N.W.2d at 715–16. "[O]nly where the misconduct, viewed in the light of the whole record, appears to be inexcusable and so serious and prejudicial that the defendant's right to a fair trial was denied" should relief be granted. *Id.* at 716. A reviewing court considers the closing argument as a whole and does not focus on selective phrases or remarks. *State v. Walsh*, 495 N.W.2d 602, 607 (Minn.1993). In addition, the failure to object or request a curative instruction weighs against reversal. *State v. Brown*, 348 N.W.2d 743, 747 (Minn.1984).

In this case the remark was made not so much to compare appellant to Simpson but rather to allege something about police officers. The prosecutor stated that appellant was *not* like Simpson. In addition, the comment was by no means a theme of the closing argument and cannot be given undue prominence. *See Stewart*, 514 N.W.2d at 564 (holding no new trial warranted where prosecutor's remarks were isolated in the context of a lengthy and otherwise fairly tried case). In light of appellant's failure to object or seek a curative instruction at trial, we cannot conclude that the comment warrants a new trial.

In sum, the district court properly denied appellant's motion to dismiss the indictment, did not clearly err in concluding the prosecutor's peremptory strike of a juror did not amount to purposeful discrimination, and did not abuse its discretion in its evidentiary rulings. Further, the circumstantial evidence was sufficient to support the verdict, and appellant is not entitled to a new trial based on the alleged prosecutorial misconduct.

Affirmed.

MEYER, J., not having been a member of this court at the time of argument and submission, took no part in the consideration or decision of this case.

PAGE, Justice (concurring in part, dissenting in part).

I respectfully dissent because I believe the court's *Batson* analysis is faulty.[1] Sadly, as a result of this decision, the court once again denies full participation in the justice system to one of Minnesota's nonwhite citizens. *See, e.g.,* William E. Martin & Peter N. Thompson, *Removing Bias from the Minnesota Justice System,* Bench & Bar, August 2002.

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court set forth a three-part test for determining whether a juror has been struck for a constitutionally infirm reason. This test, which was redefined in *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), requires, first, that the opponent of a peremptory challenge make out a prima facie case of racial discrimination.[2] *Id.* at 767,

---

1. I do not disagree, however, with the court's analysis and conclusions on issues one and three.

2. To make out a prima facie case, the opponent initially must show that he or she is a

member of a racial group capable of being singled out for differential treatment. *Batson,* 476 U.S. at 94, 106 S.Ct. 1712. The opponent may then show that "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.*

115 S.Ct. 1769. If the opponent successfully makes out a prima facie case, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation for the strike. *Id.* Under *Purkett,* the explanation need not be "persuasive, or even plausible"; the sole issue is the facial validity of the explanation. *Id.* at 768, 115 S.Ct. 1769. Once a race-neutral explanation has been offered, the court must decide whether that explanation is a pretext for racial discrimination. *Id.* At this third step, the persuasiveness of the proposed explanation becomes relevant and the court may disbelieve the explanation if it is "implausible or fantastic." *Id.*

Here, the trial court correctly concluded that Taylor made out a prima facie case of racial discrimination. The prospective juror, an African American woman, was from a racial group capable of being singled out for differential treatment. Moreover, she was one of only three persons of color on the jury panel. In coming forward with its race-neutral explanation for the strike, the prosecutor stated that one reason was that the prospective juror indicated that she was generally "indifferent" toward police officers.[3] Additionally, the prosecutor explained that the prospective juror had been hospitalized for depression and that she was on anti-depressant medication. The trial court found the reasons were not race-neutral because they were implausible

3. Upon asking the prospective juror in question about her general feelings toward police officers, the following discussion took place:

Q. You mentioned—there was a question that said "What are your general feelings about police officers," and there was a positive, negative and other, and you checked "other", and you said your feelings were indifferent. You said, "They can be there to help you or to hurt you."

A. Uh-hum.

Q. Tell me a little bit more about that answer.

A. I believe it was just basically because of all of the things that you hear off of TV, the Rodney King incident and just the beatings, and so I think I was going off of that. Me personally, I've never, I've only had contact with one officer other than being pulled over once for a crack in my windshield, but it's basically they're either there to help you, you know, to serve justice or do what they have to do, otherwise they can turn, and you hear all these stories about how some police officers, you know, tamper evidence and stuff like that, and I believe that my answer came from just hearing things over the years about police officers.

Q. Okay. In the next question you were asked whether you would give police officers more credibility, less credibility or the same credibility as any other witness, and you said you'd give them the same credibility.

A. Uh-hum.

Q. And you said, "I would listen to all testimony with an open mind."

A. Uh-hum.

Q. It sounds as though your personal experiences with police officers have been good or positive?

A. The one or two, yeah.

Q. Okay. Fortunately your contacts have been limited, but you are certainly aware of situations where the police have not acted appropriately—

A. Yes.

Q. —but it sounds as though you would listen to police testimony in this case with an open mind and decide what to make of it; is that fair to say?

A. I would have to say yes because I would listen to everybody the same. I wouldn't form any opinions. I'm not the type of person to form opinion, and so I would listen with an open mind, and it's just basically I go off of logic or my intuition.

Q. So you don't come in here with any baggage about police officers doing bad things, you come in here with your knowledge of what goes on in the community and you're prepared to keep an open mind and listen to what they have to say?

A. Yes.

given the record from voir dire.[4] The prosecutor also offered four other explanations for the strike, which largely referred to the prospective juror's experiences with the criminal justice system. The trial court found these reasons to be race-neutral. The trial court found that the prosecutor's explanations as a whole were not a pretext for racial discrimination and, therefore, that Taylor failed to carry his burden of proving purposeful discrimination.[5]

The court, in affirming the trial court's resolution of Taylor's *Batson* challenge, concludes that all the reasons given by the prosecutor for striking the prospective juror are race-neutral and not pretextual. In its discussion of the juror's indifferent attitude toward police, the court goes on to conclude that striking a potential juror for having an indifferent attitude toward police is race-neutral, although "nonsensical." However, when examining this nonsensical reason in context of the remaining nondiscriminatory reasons, the court concludes "the absurdity [does not] indicate[ ] an

intent to discriminate." I believe that this conclusion is erroneous. Indifference towards the police, as explained by the prosecutor as one basis for striking the prospective juror, while race-neutral on its face, on the facts presented here constitutes pretext for racial discrimination.

Criminal defendants have a constitutional right to a fair trial by an impartial jury. U.S. Const. amends. VI, XIV; Minn. Const. art. 1, §§ 6, 7; *State v. Varner,* 643 N.W.2d 298, 304 (Minn.2002). The prospective juror stated that police officers "can be there either to help you or to hurt you." She stated that she would give all police officers the same credibility as other witnesses and that she "would listen to all testimony with an open mind." These statements evince a clear lack of partiality or bias for or against police officers. Although the court suggests that the prospective juror's view of police officers was less than indifferent, this was not the prosecutor's explanation for the strike. Furthermore, the record before us does not support such a conclusion. A review of the

---

4. In determining that the explanations regarding the prospective juror's depression and indifference toward police officers were race neutral, the trial court stated:

> I do say, however, that the record is not clear that Ms. Hartman is currently on medication or when she was hospitalized and I do not accept that reason as a race-neutral basis for having struck her without any questioning at all.
>
> It's true that her treatment may have been more significant than others, but we don't know that. It may also have been equally as significant as others. We just don't know.
>
> In the same respect, a number of individuals have indicated in different words an indifference to police officers because in their opinion they can either help you or hurt you and I'm paraphrasing the words that have been used by the jurors, I'm not quoting them, and I apologize if I'm mischaracterizing any of their comments, but those reasons, at least as far as I can tell,

would not be, on this record, enough to have said that the reason is race neutral.

5. In determining that Taylor failed to carry his burden of proving purposeful discrimination, the trial court stated:

> With regard to the tampering of evidence, the DNA evidence, the uncle who had been killed, the boyfriends in prison and specific comment made about the one boyfriend and the length of his sentence, and the age of the potential juror, who is 19, those are race neutral, and in the context of this jury selection process given [the prosecutor's] prior actions with other jurors as well as the reasons stated specifically for [the prospective juror] and the rationale, I find that they are race neutral and that they are not a pretext for discriminatory removal.
>
> Accordingly, I find that the defendant has not carried his burden of proving purposeful discrimination, and I deny [the defense counsel's] challenge to [the prosecutor's] peremptory challenge.

prospective juror's voir dire indicates that her attitude toward and general feelings about police officers was indeed indifferent.

"Indifferent" means "[h]aving a neutral or unbiased disposition; * * * [n]ot inclined or affected to one side, party, or cause more than to another; unprejudiced." *Webster's New International Dictionary* 1266 (2d ed.1959). Juror indifference toward police officers is necessary to ensure jurors' impartiality and the criminal defendant's right to a fair trial. *See, e.g., State v. Logan*, 535 N.W.2d 320, 324 (Minn.1995) (conviction in double homicide reversed because juror exhibited bias favorable toward police officers, which resulted in denial of due process). When viewed, as we must at the third step of the *Batson* analysis, I can only conclude that the prosecutor's explanation for the strike—that the prospective juror was indifferent towards the police—is "fantastic." *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769. The problem with the prosecutor's explanation is that it is inconsistent with the fair administration of justice and Taylor's right to a fair trial by an impartial jury. A juror cannot legitimately be struck from service for being qualified to serve—that is, for being impartial and unbiased.[6] Thus, the prosecutor's explanation is clearly pretextual; the question left to be determined is pretext for what.

While great deference is given to the trial court's findings of fact, this court need not blindly accept the trial court's interpretation of those findings when evaluating the sufficiency of the prosecutor's explanation. This court can evaluate the sufficiency of the prosecutor's explanation as a matter of law. See *Purkett*, 514 U.S. at 769, 115 S.Ct. 1769. In its analysis of the prosecutor's reasons for striking juror 25, the trial court discussed how other prospective jurors were not stricken from the jury even though they too expressed indifference towards police officers.[7] It appears that the individuals the trial court was referring to were not people of color. As the trial court noted, and the record confirms, juror 25's statements regarding police were not substantially different from those individuals. Because race appears to be the only distinguishing trait between juror 25 and those jurors who held the same views towards police, but were not stricken, I can only conclude that the prosecutor's explanation was pretext for discrimination on the basis of race. There can be no other plausible reason for striking this African–American juror based on indifference towards the police, since a trial by impartial jurors is exactly what our Constitution promises to all defendants. Therefore, I conclude that Taylor has carried his burden of persuasion under the third step of *Batson*. As we said in *State v. McRae*, 494 N.W.2d 252, 257 (Minn.1992), "striking of this juror on the basis of [that answer] in effect would allow a prosecutor to strike any fair-minded, reasonable black person from the jury

---

6. With respect to jurors from racial groups capable of being singled out for discrimination, if they can be stricken because they are impartial, I suspect they would have little chance, if any, of serving on juries. Because, on its face, the explanation here is neutral, prosecutors could hide behind the prospective juror's impartiality as it relates to any juror, irrespective of color and, consequently, make it virtually impossible to identify racial discrimination in the jury selection process.

7. It is important to note that the trial court's review of the record also indicates no distinction between juror 25's depression and those other prospective jurors with depression who were not stricken. As such, this further substantiates a finding that juror 25 was stricken because of her race.

panel who expressed" a lack of bias for or against police officers.

Having concluded that the explanation was pretext for racial discrimination, the next question is whether one pretextual reason taints the race-neutral and non-pretextual reasons given for the strike. The answer, I believe, is yes. Defendants have "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria," *Batson*, 476 U.S. at 85–86, 106 S.Ct. 1712, and prospective jurors have the right not to be denied participation in jury service because of race, *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 616, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). What is more, "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87, 106 S.Ct. 1712; *Powers v. Ohio*, 499 U.S. 400, 412, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) ("Active discrimination by a prosecutor during this process [of jury selection] condones violations of the United States Constitution within the very institution entrusted with its enforcement, and so invites cynicism respecting the jury's neutrality and its obligation to adhere to the law."). Thus, *Batson* was crafted to safeguard the jury selection process from racial discrimination, to protect the constitutional rights of defendants and prospective jurors, and to protect public trust and confidence in our system of justice. *See generally Batson*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. To excuse a prosecutor's consideration of discriminatory reasons because there were also nondiscriminatory reasons for striking a juror would frustrate the purposes underlying *Batson*.

Moreover, it must be acknowledged that, because *Batson* protects against only the most obvious examples of racial prejudice, it is, from a practical perspective, an imperfect device for ensuring that jurors are " 'indifferently chosen.' " *Id.* at 86–87, 106 S.Ct. 1712 (citation omitted); *see id.* at 105–06, 106 S.Ct. 1712 (Marshall, J., concurring) (noting that "defendants cannot attack the discriminatory use of peremptory challenges at all unless the challenges are so flagrant as to establish a prima facie case" and that, "when a defendant can establish a prima facie case, trial courts face the difficult burden of assessing prosecutors' motives," which "[a]ny prosecutor can easily assert" and which "trial courts are ill equipped to second-guess"). Thus, I share the viewpoint of the Supreme Court of South Carolina, which stated:

> To excuse such obvious prejudice because the challenged party can also articulate nondiscriminatory reasons for the peremptory strike would erode what little protection *Batson* provides against discrimination in jury selection. The challenged party should not have an opportunity to convince the judge that he would have struck the juror regardless of the discriminatory reason.

*Payton v. Kearse*, 329 S.C. 51, 495 S.E.2d 205, 210 (1998).

I would reverse Taylor's conviction and remand for a new trial.

ANDERSON, PAUL H., Justice (concurring).

I generally agree with the majority's analysis and conclusions regarding appellant's claims. However, I disagree with the majority's conclusion regarding the second prong of the *Batson* test. Therefore, I write separately.

In its analysis of appellant's *Batson* claim, the majority concludes that an indifferent attitude toward the police is a facial-

ly race-neutral explanation for exercising a peremptory strike. This conclusion is the result of an emphasis on the concepts of "race" and "neutrality" at the expense of the term "explanation." As the majority notes, a race-neutral explanation for a strike is a justification that is not inherently discriminatory. Indifference is defined as "lack of partiality; unbiased." *The American Heritage Dictionary of the English Language* 919 (3d. ed.1992). It is neutral in the sense that it does not favor one side or the other and race-neutral in the sense that it does not mention race as a possible influence. But indifference toward the police cannot be considered a valid reason for a peremptory strike under the second prong of *Batson.* I agree with Justice Page when he states that "[a] juror cannot legitimately be struck from service for being qualified to serve—that is, for being impartial and unbiased." Therefore, I conclude that when asserting this explanation, the state did not meet its burden under *Batson's* second prong by articulating a facially race-neutral reason for its peremptory strike. However, because there were other race-neutral reasons offered by the state for striking this particular juror, I concur in the result reached by the majority on the *Batson* issue.