*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1731**

State of Minnesota,
Respondent,

vs.

David Wayne Elvig,
Appellant.

**Filed September 8, 2014
Affirmed
Halbrooks, Judge**

Anoka County District Court
File No. 02-CR-11-6334

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Susan B. Crumb, Assistant County Attorneys, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Susan J. Andrews, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Halbrooks, Presiding Judge; Ross, Judge; and Hooten, Judge.

UNPUBLISHED OPINION

**HALBROOKS**, Judge

Appellant challenges his convictions of theft by swindle, arguing that the state failed to prove beyond a reasonable doubt the element of intent. Because the evidence of his intent to defraud his employees was sufficient, we affirm.

## FACTS

Appellant David Wayne Elvig owned and served as CEO of E-Street Makers (E-Street), a business specializing in manufacturing high-end commercial and residential millwork, furniture, and cabinetry. E-Street offered its employees a benefits package that included health insurance through HealthPartners, dental insurance through Assurant Dental, and a 401(k) plan through American United Life (AUL). The 401(k) plan allowed E-Street employees to save for their retirements and borrow from their retirement funds. Both the company and its employees contributed to the insurance and retirement plans. If an employee borrowed money from his retirement plan, repayment would be taken from the employee's paycheck. Other employee contributions were also deducted from the employee's paychecks. These contributions went into the company's general operating fund out of which E-Street paid its monthly business expenses.

In early 2009, E-Street encountered financial difficulty and laid off several employees. The impacted employees were given the opportunity to continue their insurance through a COBRA program. Approximately three or four employees took advantage of this option, making monthly COBRA payments directly to E-Street. During this same time, E-Street's bookkeeper provided Elvig with weekly summaries of

2

E-Street's finances that included the current checkbook balance, deposits, anticipated receivables, and all payables that were due at the time.

Eventually, E-Street stopped making payments to its health, dental, and 401(k) plans. In February 2009, HealthPartners notified Elvig that E-Street had an outstanding balance of $10,659.40. Multiple notices were later sent notifying Elvig that E-Street's insurance would be cancelled if full payment was not received within 30 days. In March 2009, Assurant cancelled E-Street's employees' dental insurance. And in June 2009, E-Street made its last payment to AUL.

On July 28, 2009, Elvig sent a letter to his employees notifying them that "[d]ue to the economic downturn," the company would "be dropping all medical and dental coverage that ha[d] been provided." The letter also stated that employees "who are currently having premiums withheld from your paychecks are no longer being charge[d] effective July 16, 2009. Those of you who have paid your premiums through COBRA payments will be reimbursed any amounts paid past the cancellation date."

After receiving Elvig's letter, two E-Street employees contacted the Minnesota Attorney General's office (AG). Thereafter, a criminal investigation was conducted by the U.S. Department of Labor Employee Benefits Security Administration (the EBSA). During the investigation, the EBSA concluded that Elvig had embezzled $19,596.83 from his employees. Investigators discovered that $19,596.83 in employee contributions remained in E-Street's general operating account, where it was used to pay E-Street's general business expenses instead of being applied to insurance and 401(k) plans. Elvig

was subsequently charged with two counts of theft by swindle. Following a five-day jury trial, Elvig was convicted of both counts. This appeal follows.

## D E C I S I O N

Elvig argues that the evidence at his trial was insufficient as a matter of law to sustain his convictions of theft by swindle because the evidence does not show that he acted with the requisite intent to defraud his employees. Elvig claims that his actions were driven by his desperation to save his business. When reviewing a sufficiency-of-the-evidence challenge, appellate courts carefully examine the evidence in the record to determine whether the fact-finder could reasonably find the defendant guilty of the offenses. *See State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012).

Under Minn. Stat. § 609.52, subds. 2(a)(4), 3(2) (2012), it is a felony for a person to "obtain[] property or services from another person" with a value that exceeds $5,000 "by swindling, whether by artifice, trick, device, or any other means[.]" To be found guilty of theft by swindle, the state must prove that the defendant acted with an intent to defraud. *State v. Flicek*, 657 N.W.2d 592, 598 (Minn. App. 2003). "Intent may be proved by circumstantial evidence, including drawing inferences from the defendant's conduct . . . and the events occurring before and after the crime." *In re Welfare of T.N.Y.*, 632 N.W.2d 765, 769 (Minn. App. 2001) (citing *Davis v. State*, 595 N.W.2d 520, 525-26 (Minn. 1999)).

A conviction based on circumstantial evidence warrants heightened scrutiny. *State v. Al–Naseer*, 788 N.W.2d 469, 473 (Minn. 2010). When reviewing whether circumstantial evidence is sufficient to support a conviction, we apply a two-step

analysis.  *Id.* at 473-74.  First, we identify the circumstances proved, deferring to the jury's acceptance of those facts and assuming that the jury rejected all contrary facts. *State v. Silvernail*, 831 N.W.2d 594, 598-99 (Minn. 2013).  Second, we determine whether the circumstances proved are "consistent with guilt and inconsistent with any rational hypothesis except that of guilt."  *Id.* at 599 (quotation omitted).  To sustain a conviction, the circumstances proved "must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt."  *Al–Naseer*, 788 N.W.2d at 473 (quotation omitted).

Applying the first step of the circumstantial-evidence analysis, we identify the circumstances proved.  At trial, several former E-Street employees testified against Elvig. Employee T.K. testified that he had been making COBRA payments to E-Street and that on July 31, 2009, he handed his COBRA check directly to Elvig.  According to T.K., Elvig took the check from him and told him that he would soon be receiving a letter in the mail.  Elvig said nothing about T.K.'s health insurance being cancelled.  Days later, T.K. received Elvig's letter notifying him that his insurance had been cancelled.  T.K. also testified that he was one of the employees who reported Elvig to the AG.  Thereafter, T.K. received a copy of a letter that Elvig sent to the AG, stating that he was aware that T.K. had not been reimbursed for his health-insurance premiums and that it was a "top priority" for the company to pay him back.  There was also a handwritten note to T.K. on the letter that stated:

Often times memories are short. However mine is not. I remember when you came to management and shared that you needed to take on a second job as you weren't making ends meet. Management then gave you a substantial & unprecedented raise. Probably added up to well more than the 771.20 we now owe you. Hmmm.

Other employees, C.D., D.G., and C.L., all of whom had been laid off from E-Street, testified that they had opted to keep their health-care coverage for their families through COBRA. Those employees all paid their premiums directly to E-Street. They testified that E-Street took their money but did not pay their health and dental premiums.

In addition, E-Street's bookkeeper, S.G., testified at trial. S.G. was responsible for processing payroll, accounts receivable, accounts payable, and employee benefits. According to S.G., 401(k) contributions and loan repayments were withheld from employees' pay, but they were not deposited into their 401(k) accounts. S.G. testified that Elvig would tell her which bills to pay based on the weekly reports that she provided to him. She testified that Elvig was aware of the money that was owed to HealthPartners and Assurant. She told Elvig that these bills needed to be paid, and she testified that Elvig received letters and e-mails indicating that the bills were overdue.

Several e-mails were admitted into evidence at trial. In one e-mail, dated June 1, 2009, S.G. informed Elvig that HealthPartners had sent letters of cancellation to the employees and that the employees were not happy about it. She told him that this bill needed to be "paid . . . ASAP." Elvig's response was, "Yup—all I can do is wait for people to pay us—any ideas?"

6

On August 5, 2009, Elvig forwarded to S.G. an e-mail that he had sent to his attorney. In that e-mail, Elvig stated, "We were finally cancelled from health insurance on 7-30. Unfortunately it is retroactive to May which now suggests that we were collecting premiums from COBRA participants and not turning them in. Obviously the company could not match their (the lion's share) of the premium to supply the benefit."

In another instance, Elvig forwarded S.G. an e-mail from the EBSA. This e-mail informed Elvig that the department would be conducting an investigation. Elvig advised S.G. that the investigation was just routine and that there was no need to worry. S.G. responded, "You do remember that we are in arrears with making the AUL(401K) payments, and that there is the issue with not as of yet paying back the insurance premiums that we had withheld from employees." Elvig responded, "Yup I'm aware - thanks."

In an e-mail dated January 12, 2010, an employee wrote to Elvig that he had received his 401(k) statement and noticed that "there ha[d] not been 1 dime [paid] to [his] loan[,] even though $150 + dollars [was] taken from [his] check [each] month." The employee acknowledged that E-Street was in serious financial straits, but requested that money no longer be taken from his paychecks. Elvig responded: "Yup work it out. I haven't gotten any payments, either – oooopps nor have I even had a paycheck since mid August. Do what you have to do."

Elvig testified that he had no role with respect to processing payroll in 2009. But Elvig agreed that S.G., the bookkeeper, "answered to [him]." Elvig stated that he knew some employees were paying for their health insurance out of payroll deductions. He

conceded that it was E-Street's responsibility to make payments to the employees' insurance and 401(k) plans as a benefit to them. He testified that he did not make these payments because "we couldn't afford to pay all of our bills," and payroll and materials were deemed higher priorities. Elvig agreed that it would have been better to have given his employees and COBRA participants a chance to decide how to move forward with insurance coverage, and he also agreed that he owed his employees money.

The state proved the following circumstances at trial: (1) Elvig knew that his employees contributed to their insurance and 401(k) plans; (2) Elvig knew that employees' contributions were withheld from their paychecks and that some former employees made COBRA payments directly to E-Street; (3) Elvig knew that E-Street was not making payments to the insurance and 401(k) plans, his bookkeeper informed him that these bills were overdue and he received multiple notices that E-Street faced cancellation of its insurance plan; (4) Elvig chose to prioritize other business expenses instead of making these payments; (5) Elvig, by his own admission, owed money to his employees and former employees.

The second step of the circumstantial-evidence analysis requires us to examine whether the circumstances proved at trial are "consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Silvernail*, 831 N.W.2d at 599. Elvig argues that the circumstances proved at trial did not exclude the reasonable inference that his decision to prioritize other business expenses was driven by his desperation to save his business and not by an intent to defraud. We disagree that these motives are mutually exclusive. "[P]ossibilities of innocence do not require reversal of a jury verdict so long

8

as the evidence taken as a whole makes such theories seem unreasonable." *State v. Taylor*, 650 N.W.2d 190, 206 (Minn. 2002) (quotation omitted).  The theft by swindle "statute punishes any fraudulent scheme, trick, or device whereby the wrongdoer deprives the victim of his money or property by deceit or betrayal of confidence." *State v. Ruffin*, 280 Minn. 126, 130, 158 NW.2d 202, 205 (1968).  By knowingly taking money from his employees' paychecks, accepting COBRA payments, and failing to forward these amounts to the appropriate facilities and by discontinuing the company's contributions without informing his employees, Elvig betrayed his employees' confidence and deprived them of wages earned, 401(k) funds, health insurance, and dental insurance.  The circumstances proved at trial form a complete chain that leads directly to Elvig's guilt.

Because the only rational inference consistent with the circumstances proved at trial is that Elvig intentionally took money from current and former employees to pay for ongoing business expenses, we conclude that the evidence was sufficient to sustain his convictions.

**Affirmed.**